UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Mariano Madrid,

        Petitioner

v.

William Hutchings,[1] et al.,

        Respondents

Case No. 2:19-cv-01659-APG-NJK

**ORDER**

In March of 2007, a jury convicted petitioner Mariano Madrid of murder with the use of a deadly weapon with the intent to promote, further, or assist a criminal gang, and Madrid was sentenced to 40 years to life. Ex. 32 and ECF No. 27-2 at 2; Ex. 44 and ECF No. 28-7. Madrid has filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 9–9-3. I now decide the merits of the remaining grounds in the petition[2] and Madrid's request for a copy of the docket for this matter (ECF No. 54). For the reasons discussed below, I dismiss with prejudice grounds 1(A)–1(F), 1(G)(d) and (f), 1(H)(d)–(e), and 1(J), deny federal habeas relief for grounds 1(G)(a)–(c) and (e), 1(H)(a)–(c), and 1(I), deny the petition (ECF Nos. 9–9-3), deny a certificate of appealability, and direct the clerk of the court to enter judgment in favor of the

---

[1] According to the state corrections department's inmate locator page, Madrid is incarcerated at Southern Desert Correctional Center. The department's website reflects William Hutchings is the warden for that facility. https://doc.nv.gov/Facilities/SDCC_Facility/. I will therefore direct the clerk of the court to substitute William Hutchings for respondent Jerry Howell under Rule 25(d) of the Federal Rules of Civil Procedure.

[2] I previously dismissed grounds 2, 3, 4, and 5 as procedurally defaulted and deferred consideration whether Madrid can demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) to overcome the procedural default of grounds 1(A–F) and 1(J) until after the filing of an answer and reply in this action. ECF No. 41 at 12.

respondents and against Madrid. As a one-time courtesy to Madrid, I will grant his request for a copy of the docket and direct the clerk of the court to send to him one copy of the docket.

I.    **Background**[3]

    A.    **The Party and the Shooting**

Arlin Delgado and her sisters held a party at their house near East Lake Mead and Boulder Highway in Henderson, Nevada while their parents were away on May 21, 2005. Ex. 25 and ECF No. 25-2 at 3–11. When Delgado realized some of the guests were uninvited and underage drinkers she decided to "kick everybody out." *Id.* She later heard gunfire and called 9-1-1; the police arrived in 10 to 15 minutes. *Id.*

Jesse Lackey testified 30 to 40 people were present when he and his friend, R.M., who was a Surfos gang member, arrived at the party. *Id.* at 32–33. Lackey and R.M. were in front of the house when J., a DLK gang member, exited the house with 12 to 13 people. *Id.* Lackey said R.M. and J. had a history of conflict and argued until Madrid (a stranger to Lackey) told them, "This is my neighborhood" and said, "something from Henderson." *Id.* at 34. Lackey said someone punched R.M. in the face, a fight broke out, shots were fired, and he ran away. *Id.* at 34–35. Lackey said R.M. ran alongside him and said, "I'm hit. They hit me," but did not identify the shooter. *Id.* at 35, 39. Lackey said he saw Madrid "right next to the cars . . . shooting" at Lackey and R.M. while holding a gun in what he believed was Madrid's right hand. *Id.* Lackey said police interviewed him, but he did not identify the shooter because he thought they would release him if he had nothing to do with it. *Id.* at 35–36, 41. Lackey and S.D. (another friend

---

[3] I make no credibility findings or other factual findings regarding the truth of evidence or statements of fact in the state court. I summarize them solely as background to the issues presented in this case and do not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding made by me. Any absence of mention of a specific piece of evidence or category of evidence does not mean that I overlooked it in considering the claims.

who attended the party) went to Mexicali the next day after they learned R.M. died. *Id.* at 37, 41–42.  Lackey described the shooter to a girl who identified the shooter as Madrid. *Id.*  Nine days after the shooting, police showed Lackey a photographic lineup array and he identified Madrid as the shooter. *Id.* at 36–37, 41.  At trial, Lackey testified he did not see R.M. with a knife or see Madrid get stabbed. *Id.* at 40.

S.D. testified he attended the party and was a friend of R.M. Ex. 24 and ECF No**.** 25-1 at 28–30.  He said he saw R.M. and J. argue and heard Madrid (a stranger to him) say, "'This is Henderson' or something like that, 'Los Hermanos'" and make a hand gesture. *Id*. at 31–32, 38.  He said one of Madrid's friends punched R.M., and everyone started fist-fighting. *Id.*  S.D. said "three guys had [R.M.]" on the driver's side of a car, but S.D. did not see a weapon on R.M. and saw no one with a knife. *Id.* at 31–32, 39.  S.D. said he was fighting two of Madrid's friends, but broke free and went toward R.M., but then saw Madrid, who was five feet away and facing him and R.M., shoot "twice in the air" while stating, "Henderson, Los Hermanos." *Id.* at 32–33, 40.  S.D. said he saw R.M. get shot in the throat and chest and heard R.M. say, "Sergio shot me. Take me to the hospital." *Id.*  S.D. hid at a church and left for Mexicali with Lackey the next day for a preplanned trip, where he stayed for three months. *Id.* at 34, 41.  Upon S.D.'s return to Henderson, he was told detectives had questions for him. *Id.* at 35–36.  S.D. did not immediately contact police but met them just before trial and identified Madrid as the shooter. *Id.*

F.S. testified he was a friend of R.M. and attended the party. Ex 25 and ECF No. 25-2 at 12, 17.  He said he heard Madrid (a stranger to him) tell R.M. and J. "they were not gonna fight" because "this was his neighborhood" and he was from "this one gang, LH" and "nothing was gonna happen." *Id.* at 13, 16–17, 23.  F.S. said someone hit R.M. and then he saw Madrid running to a green or gray car, open the door, move the seat, pull out a shiny chrome gun with

his right hand, heard him say "Now what, now what," and then saw him shoot at F.S. and R.M. *Id.* at 13–14, 18–23.  F.S. said R.M. grabbed the back of his neck and they ran from Madrid to opposite side of the street. *Id.* at 14–15, 17.  F.S. knew R.M. to carry a butterfly knife but did not see it and did not see R.M. stab anyone. *Id.* at 15, 21.  F.S. hid at a nearby church with S.D. where they discussed the incident. *Id.* at 22.  F.S. subsequently called "many people," "to know who was the shooting guy" and was told the shooter was a rapper named "Nano." *Id.* at 20, 22. F.S. said he investigated "who it was" and obtained a copy of Nano's rap compact disc (CD). *Id.* F.S. identified Madrid as the shooter based on a photographic array. *Id.* at 15–16, 20, 22.

Ignacio Cervantes was the fourth friend of R.M. to testify that he attended the party, and said he heard Madrid say, "something about Henderson side" and "then LH, LAH, something like that." *Id.* at 23–25, 30–31.  Cervantes said R.M. was hit, a fight broke out, he heard "[s]omething about '[h]e's packing,'" and saw Madrid in the middle of the street shooting a gun held in his right hand. *Id.* at 25–26, 30–31.  Cervantes said after the shooting started, he saw R.M. pull out a knife, however, he did not see R.M. approach or stab Madrid and did not see Madrid get stabbed. *Id.*  Cervantes said he and R.M. ran in the same direction, and although he heard R.M. say, "I'm shot.  Take me to the hospital," R.M. did not identify his shooter. *Id.* at 26–27, 31.  Cervantes said he initially told police he did not see the shooter because he was afraid of Madrid and Madrid's friends; but 10 days later, he identified Madrid as the shooter in a photographic lineup array.  *Id.* at 27–29.

Clark County forensic pathologist Larry Simms testified that Gary Telgenhoff performed the autopsy on R.M., and according to Telgenhoff's report, R.M. died of multiple gunshot wounds. Ex. 29 and ECF No. 26-2 at 45–48, 55.  One bullet entered R.M.'s left thigh and exited

the back of that thigh; another entered his left back and exited the left side of his neck; and a third grazed the back of R.M.'s right calf. *Id.* at 48–49.

### B.     The Stabbing

Ernest Duron testified he attended the party and was a long-time friend of Madrid. Ex. 29 and ECF No. 26-2 at 112–16, 120.  He said he heard someone say, "he's packing," saw Madrid run, and then "boom," "a Mexican kid with a black hat" wearing a black jersey, pushed Madrid against his car and stabbed Madrid in the ribs. *Id.* at 121–25.  Duron said he tried to run to Madrid, heard "bangs," and crouched down. *Id.* at 125, 129, 131–32.  He said he heard shots coming from behind "when" Madrid was stabbed and as he ran toward Madrid. *Id.* at 129–32. He said he got scared and entered a friend's vehicle and left the scene. *Id.* at 125.  He denied seeing Madrid with a firearm or shoot anyone. *Id.*

D.F., also a friend of Madrid, testified he was walking to his car, heard gunfire, and then ran to his car, but did not see the shooter. Ex. 24 and ECF No. 25-1 at 42–44, 46–48.  He later saw Madrid's White Cavalier vehicle swerving with the lights off. *Id.*  When D.F. telephoned Madrid, Madrid said he was stabbed, so D.F. drove Madrid's car, which had "blood all over it," to the hospital. *Id.* at 45.  Madrid never told D.F. that he shot anyone. *Id.* at 47.  D.F. left Madrid's car down the street from the hospital because he was "scared," "high" "drunk" and there was blood in the car. *Id.* at 45, 48.  He said he told Duron where he parked it and might have told Madrid's father. *Id.*  D.F. said "[t]here was no gun" in the car and he did not expect one there. *Id.* at 46–48.  He told police he did not see the shooter and testified he did not know the shooter's identity. *Id.* at 45–47.

////

////

## C.      Eyewitness Identifications

Henderson Police Department Detective Frank Fuentes testified he saw Madrid's wound to his right forearm on the night of the shooting. Ex. 27 and ECF No. 25-4 at 94–96.  Fuentes said witnesses told him that R.M. never identified his attacker. *Id.* at 102–03.  Fuentes said Madrid told him he was stabbed while running away from gunfire, but could not identify the stabber, and only realized he was stabbed when he lost feeling in his arm and saw blood. *Id.* at 101–02, 104–05.  Henderson Police Department Detective Gerald Collins testified Madrid told him he heard gunshots and was stabbed while approaching his vehicle but did not see the shooter. Ex. 26 and ECF No. 25-3 at 22–23, 40.  Collins said Madrid told him "he heard the shots first and then he got stabbed as he was moving to his vehicle." *Id.*  Madrid did not admit to shooting R.M. and told police he did not own a gun and never handled or shot one. *Id.* at 37, 40.

Detective Collins testified no one identified the shooter on the night of the shooting. *Id.* at 21, 35.  Collins said he later located Lackey (after his return from Mexicali) and Lackey identified Madrid as the shooter in a photographic array. *Id.* at 34–35.  Collins arrested Madrid based on Lackey's identification. *Id.* at 22.  Shortly after Madrid's arrest, F.S. and Cervantes identified Madrid as the shooter in photographic arrays. *Id.* at 25–26.  Collins said S.D. identified Madrid as the shooter in a photographic array shown to him a few days before trial. *Id.*

## D.      Fingerprints, Gunshot Residue, Bullets, and Casings

Detective Collins testified police found no firearms except a BB gun. Ex. 26 and 25-3 at 17–18, 28.  Henderson Police Department crime scene analyst Stephanie Fox testified she recovered (1) a glass pipe; (2) three bullet cartridge casings on the street; (3) one bullet cartridge casing on the sidewalk; (4) a bullet jacket from the floor below the window in the party house; (5) a bullet fragment and a bullet from a trailer and a truck next to the party house; (6) a butterfly

1   knife; and (7) presumptive blood samples from a blood trail in the street. Ex. 27 and ECF No.

2   25-4 at 54–71, 86–88, 92.  Fox identified photographs depicting blood near the casings and a

3   pipe within an arm's length of three casings. *Id.*  The knife was recovered elsewhere from the

4   street and tested negative for latent fingerprints, as did all four casings. *Id.* at 61–65, 82–87.  Fox

5   did not know whose blood was on the street. *Id.* at 90.  Henderson Police Department latent

6   fingerprint examiner Clay Allred concluded Madrid's fingerprints were on the pipe. Ex. 26 and

7   ECF No. 25-3 at 9, 11, 13–15.

8         Las Vegas Metropolitan Police Department forensic scientist James Krylo determined the

9   casings were fired by a single semiautomatic .40 caliber firearm. Ex. 29 and ECF No. 26-2 at

10   23–24, 32–36.  He further concluded the bullet and bullet fragment found at the scene exhibited

11   rifling consistent with a single .40 caliber firearm, but they did not provide sufficient

12   microscopic detail for him to conclude they were fired by the same firearm. *Id.*

13         Henderson Police Department patrol officer James Donnelly testified he impounded

14   clothing worn by R.M. and Madrid, who were treated in the same trauma room at the hospital.

15   Ex. 26 and ECF No. 25-3 at 4–5, 8–9.  Crime scene analyst Fox testified she obtained the

16   clothing from Donnelly. Ex. 27 and ECF No. 25-4 at 77–79.  Crime scene analyst Maria Weir

17   testified she collected fingerprint and presumptive blood and gunshot residue samples from the

18   interior and exterior of Madrid's vehicle, and gunshot residue samples from R.M.'s hands. *Id.* at

19   7–8, 10–13, 16–17.  Forensic scientist Crystina Vachon, with the Bexar County Criminal

20   Investigation Laboratory in San Antonio, Texas, confirmed she received the clothing and

21   samples taken from Madrid's vehicle and R.M.'s hands and concluded there were no gunshot

22   residue particles on R.M.'s hands, but there were gunshot residue particles on the front of

23   Madrid's clothing, inside and outside Madrid's vehicle, and on the front of R.M.'s jeans. *Id.* at

24–25, 32–44, 50–53.  Vachon opined the particles could have made their way to the interior of Madrid's vehicle if the shooting occurred near the driver's door and window if they were open. *Id.*  The defense called forensic scientist Alfred Schwoeble with the R.J. Lee Group, an analytical laboratory in forensic sciences, chemistry, and general materials analysis. Ex 33 and ECF No. 27-3 at 6.  Schwoeble agreed with Vachon's findings but added that gunshot residue particles may have been present where they were found due to secondary transfer or if the individuals involved were located within the "plume" of the gunfire. *Id.* at 17–19, 26–27.

### E.   Additional Gang Evidence

Henderson Police Department Detective Fred Hutchison testified he worked in gang intelligence and was familiar with the multigenerational Los Hermanos criminal gang whose territory was in the area of the party house, i.e., Lake Mead and Boulder Highway in Henderson. Ex. 29 and ECF No. 26-2 at 73, 77, 80.  He testified Madrid was a documented Los Hermanos gang member and identified photographs depicting Madrid with known gang members throwing up the "L" and "H" for Los Hermanos, and a "W" for West Side. *Id.* at 80–84, 88, 106–07.  He said gang members who commit crimes for and in furtherance of the gang receive more respect and those who kill someone "become an idol, top notch in their gang." *Id.* at 105–06.

Detective Hutchison identified Madrid as rap singer called "Nano" on two gangster rap CDs, in which "[a]lmost every single song" "refers to the gang life, the gang lifestyle, killing people, stealing from people, partying and talking about other gang activities." *Id.* at 88–89. Hutchison read to the jury a portion of the pamphlet accompanying one of Nano's CDs that includes "shout-outs" to "[h]omies from Los Hermanos, 28th Street, Little Locos, Donna Street,

1  MOB and all other Vegas gangs, all the homies in Cali, New Mexico, Arizona, Colorado." *Id.* at

2  89–90.  Madrid's song "Bullet Holes" was played for the jury.[4] *Id.* at 92–94.

3      **F.      Madrid denied gang membership and shooting R.M.**

4      Madrid testified he was 18 years old when he attended the party. Ex. 30 and ECF No. 26-

5  3 at 6.  He left the party because he thought the police had arrived and he was underage and had

6  been drinking and smoking marijuana. *Id.* at 14, 20–21.  He saw a group of women sandwiched

7  between two groups of men. *Id.*  The women were telling the men to leave, so Madrid said he

8  told the men, "Hey, you know what, the party is over, go ahead and go." *Id.* at 21–22.  Madrid

9  said he walked toward his car, heard people argue behind him, turned around and saw a lot of

10  people fighting, heard gunfire, and then ran to his vehicle. *Id.* at 23–24, 34.  He did not know

11  from which direction the shots came. *Id.*  Madrid denied having a firearm, denied shooting

12  anyone, and denied seeing anyone with a gun prior to the stabbing. *Id.* at 35, 40–41.  He said he

13  would not have been able to hold a gun in his hand after he was stabbed. *Id.*  He testified he heard

14  gunfire before he was stabbed. *Id.* at 26–27, 34, 72–73.

15      Madrid testified a dark figure ran into him and then continued running away. *Id.* at 24–

16  25.  Madrid said he did not realize he was stabbed until his arm "wasn't getting the message" to

17  grab his keys, and he saw blood. *Id.*  He was stabbed in his right forearm "through and through"

18  and used his left hand to grab his keys. *Id.* at 12–13, 55.  He said he is right-handed and was

19  unable to hold a gun in his right hand after he was stabbed. *Id.* at 40–41. He told police he did

20

21

22  ─────────
[4]  A summary of the song "Bullet Holes," including its lyrics, is set forth in Madrid's motion for
new trial. Ex. 40 and ECF No. 28-3 at 5–10.  Before the rap portion of the song, a newscaster
23  refers to a murder of teenage boy that police say, "is the work of a gang" and a capital murder
case "believed to be both drug and gang related." *Id.* at 6. The song lyrics include references to
"a battle over colors" "gangs and drugs." *Id.* at 7–10.

1   not know who stabbed him. *Id.* at 44.  During an interview with police the next day, he was

2   unable to draw a diagram because he was incapable of writing with his right arm. *Id.* at 33.

3   Madrid admitted his pipe was found in the street at the scene. *Id.* at 41, 56.  He said he

4   voluntarily gave his clothing to police and voluntarily went to the police station for an interview

5   the day after the incidents. *Id.* at 31, 55–56.  He claimed S.D., F.S., Cervantes, and Lackey are

6   each mistaken in their identifications of him as the shooter and pointed out that he was the only

7   person from the party who was included in the photographic arrays. *Id.* at 68–70.

8   Madrid said he is a rap artist whose songs were played on the radio, and he had

9   performed at the House of Blues in Las Vegas, California House of Blues in Anaheim, and B.B.

10  King at City Walk at Universal Studios. *Id.* at 9–10.  He said he is associated with ASCAP music

11  group, his music genres include Hip-hop, Rap, and R & B, he had been photographed with other

12  rap artists, and he authored two of the 19 songs on one of his CDs. *Id.* at 10–11, 82–83.  He

13  explained that it is well-known that he is a "poser" and not a gang member, and that his gang

14  attire is "a fad" of his "artist persona." *Id.* at 47–48, 83.  He explained "all" of his "writing is

15  fictional entertainment" and said he wrote "Bullet Holes," after charges were filed in his case. *Id.*

16  at 66, 82, 84.  He denied being a leader of the Los Hermanos gang and said his CD sales did not

17  skyrocket following the crime. *Id.* at 47.

18  Madrid admitted his father was a Los Hermanos gang member as a teenager but had since

19  become a director of internal maintenance at the Sahara Hotel. *Id.* at 81.  Madrid admitted he

20  associated with Los Hermanos by hanging around members, and admitted he knew the hand

21  sign, and made the sign in photos admitted at trial, but denied he was "jumped" into, or initiated

22  into, any gang. *Id.* at 37–38.  He said he made the hand signals in the photographs because it is

23  part of his persona, and he was messing around with his friends. *Id.* at 49, 52.  He said he has

10

1  friends of different races from different gangs and was aware that police files included his name

2  for three different gangs because he was stopped in the company of gang members, but he denied

3  committing crimes for any gang. *Id.* at 48–49.  He said if he was a bona fide gang member, his

4  intermingling with members of different gangs would get him killed and would prohibit him

5  from giving "shout-outs" to members of other gangs. *Id.* at 49, 83–84.

6       On cross-examination, Madrid identified "field information sheets." *Id.* at 57–58.  The

7  State asked Madrid about one sheet concerning an August 27, 2001 incident where it was

8  asserted that he had a gang tattoo depicting three dots on one hand and the number 13 on the

9  other hand. *Id.* at 58–59.  Madrid denied involvement in the incident, denied having any gang

10  tattoos or tattoos on his hands, and claimed he had only a tattoo of the name "Madrid" on his

11  waist. *Id.* at 50–51, 58–59.  He was asked about a second sheet that reported he admitted he was

12  a Los Hermanos gang associate who threatened Ricardo Guerrero on May 8, 2002. *Id.* at 59–60.

13  Madrid denied recollection of the incident, denied knowing Guerrero, and speculated he gave his

14  mother's phone number to police or police obtained it from school records. *Id.*  Madrid admitted

15  that at booking for the instant charges he told police for safety reasons that his friends and family

16  are Los Hermanos gang members, and he should not be housed with members of rival gangs but

17  denied telling police to "check off" that he had gang involvement. *Id.* at 61–63.

18       Madrid testified he did not make a living as a rap artist and was a limousine supervisor at

19  the Wynn Hotel. *Id.* at 11.  Scott Schmidt, the Assistant Director of Staffing at Wynn Las Vegas,

20  testified in rebuttal that Wynn had no records indicating Madrid applied for a position or was

21  employed at Wynn, however, Schmidt admitted he did not check the records for Wynn

22  subcontractor Executive Star Limousines. Ex 33 and ECF No. 27-3 at 29–31.

23

1       Madrid was convicted of all charges and had no success on direct appeal and in three

2   state postconviction proceedings. Ex. 63 and ECF No. 28-26; Ex. 91 and ECF No. 31-9.  His

3   second and third state postconviction petitions were dismissed as, among other things, successive

4   and untimely. Ex. 116 and ECF No. 35-10; Ex. 132 and ECF No. 36-7.

5   **II.     Legal Standards**

6       **A.     Antiterrorism and Effective Death Penalty Act (AEDPA)**

7       The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal

8   standards for my consideration of the petition:

9           (d) An application for a writ of habeas corpus on behalf of a person
in custody pursuant to the judgment of a State court shall not be

10  granted with respect to any claim that was adjudicated on the
merits in State court proceedings unless the adjudication of the

11  claim—

12                  (1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly

13  established Federal law, as determined by the
Supreme Court of the United States; or

14

15                  (2) resulted in a decision that was based on an
unreasonable determination of the facts in light of
the evidence presented in the State court

16  proceeding.

17  28 U.S.C. § 2254(d).

18      A state court's decision is contrary to clearly established Supreme Court precedent,

19  within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts

20  the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set

21  of facts that are materially indistinguishable from a decision of [the Supreme] Court and

22  nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*,

23  538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and

12

citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court's decision is an unreasonable

application of clearly established Supreme Court precedent within the meaning of 28 U.S.C.

§ 2254(d)(1) "if the state court identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause

requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state

court's application of clearly established law must be objectively unreasonable." *Id.* (quoting

*Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks

merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has stated that

"even a strong case for relief does not mean the state court's contrary conclusion was

unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S.

170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard

for evaluating state-court rulings, which demands state-court decisions be given the benefit of the

doubt.") (internal quotation marks and citations omitted)).  "The petitioner carries the burden of

proof." *Pinholster*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

**B.     Effective-Assistance-of-Counsel**

A petitioner claiming ineffective assistance of counsel must demonstrate (1) the

attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the

attorney's deficient performance prejudiced the petitioner such that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

1   been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).  "A reasonable

2   probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  A

3   court may first consider either the question of deficient performance or the question of prejudice;

4   if the petitioner fails to satisfy either question, the court need not consider the other. *Id.* at 697.

5        "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only

6   the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).  In considering a claim

7   of ineffective assistance of counsel, a court "must indulge a strong presumption that counsel's

8   conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S.

9   at 689.  On the performance prong, the issue is not what counsel might have done differently but

10  whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–

11  90.  A petitioner making an ineffective assistance claim "must identify the acts or omissions of

12  counsel that are alleged not to have been the result of reasonable professional judgment." *Id.*  In

13  considering such claims, a court is obligated to "determine whether, in light of all the

14  circumstances, the identified acts or omissions were outside the wide range of professionally

15  competent assistance." *Id.*  Strategic choices made "after thorough investigation of law and facts

16  relevant to plausible options are virtually unchallengeable." *Id.*  On the other hand, "strategic

17  choices made after less than complete investigation are reasonable precisely to the extent that

18  reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.  It is a

19  petitioner's burden to show "counsel made errors so serious that counsel was not functioning as

20  the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.  To establish prejudice, it is

21  not enough for the petitioner "to show that the errors had some conceivable effect on the

22  outcome of the proceeding." *Id.* at 693.  The errors must be "so serious as to deprive the

23  defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

1    "Establishing that a state court's application of *Strickland* was unreasonable under

2    § 2254(d) is all the more difficult" as "[t]he standards created by *Strickland* and § 2254(d) are

3    both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Richter*, 562

4    U.S at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th

5    Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under

6    AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's

7    description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6

8    (2003)).

9        **C.    Procedural Default**

10   Where a petitioner "has defaulted his federal claims in state court pursuant to an

11   independent and adequate state procedural rule," federal habeas review "is barred unless the

12   prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

13   violation of federal law, or demonstrate that failure to consider the claims will result in a

14   fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To

15   demonstrate cause, the petitioner must establish that "some objective factor external to the

16   defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v.*

17   *Carrier*, 477 U.S. 478, 488 (1986); *Hiivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999).

18   "[T]o establish prejudice, [a petitioner] must show not merely a substantial federal claim, such

19   that 'the errors . . . at trial created a possibility of prejudice,' but rather that the constitutional

20   violation 'worked to his actual and substantial disadvantage.'" *Shinn v. Ramirez*, ___ U.S. ___,

21   142 S. Ct. 1718, 1734–35 (2022) (citing *Carrier*, 477 U.S. at 494 and quoting *United States v.*

22   *Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original).

23

Ordinarily, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause.'" *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (citations omitted).  However, in *Martinez*, the Supreme Court provided a narrow set of circumstances under which a petitioner may overcome the cause requirement for purposes of overcoming a procedural default for an ineffective assistance of trial counsel claim where he can show he received ineffective assistance of counsel in his initial state habeas proceeding. *Id.* at 14, 18.  The Supreme Court outlined the necessary circumstances as follows:

> [W]here (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 18).[5]

As stated above, procedural default will not be excused if the underlying ineffective-assistance-of-trial-counsel claim "is insubstantial," i.e., it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).  In *Martinez*, the Supreme Court cited the standard for issuing a certificate of appealability as an analogous standard for determining whether a claim is substantial. *Id.* According to the certificate of appealability standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether . . . the [issue] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed

---

[5] Nevada law requires prisoners to raise ineffective assistance of counsel claims for the first time in a state petition seeking postconviction review, which is the initial collateral review proceeding for purposes of applying the *Martinez* rule. *See Rodney v. Filson*, 916 F.3d 1254, 1259–60 (9th Cir. 2019).

further.'" *Miller-El*, 537 U.S. at 336.  Thus, to determine whether a claim is substantial, a district court does not determine whether trial counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice.  Instead, it determines only whether resolution of the merits of the ineffective assistance of counsel claim is debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them.

### D.     The Requirements of 28 U.S.C. § 2254(e)(2)

The Supreme Court recently held that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel" unless the exceptions set forth in 28 U.S.C. § 2254(e)(2) are satisfied.  *Ramirez*, 142 S. Ct. at 1734 ("[O]nly rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules.").  The requirements of § 2254(e)(2) are that:

> (A)    the claim relies on—
>
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)–(B).

In *Ramirez*, the Supreme Court considered the cases of two prisoners (Ramirez and Jones) in which the district courts considered evidence that had not been developed in the state

court records due to the alleged ineffective assistance of postconviction counsel for purposes of

holding that Ramirez and Jones overcame the procedural defaults of their trial counsel

ineffective assistance claims under *Martinez*. *Ramirez*, 142 S. Ct. at 1729–30.  In Ramirez's case,

the district court used that new evidence to deny the ineffective assistance of trial counsel claim

on the merits, while in Jones's case the new evidence was used to hold that trial counsel had

provided ineffective assistance. *Id.*  The Ninth Circuit reversed Ramirez's case for further

factfinding on the merits of the ineffective assistance of trial counsel claim and denied rehearing.

*Id.* at 1729.  In Jones's case, the Circuit court affirmed and denied rehearing. *Id.* at 1730.  The

Supreme Court reversed both cases holding the district courts erred because "[u]nder

§ 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent" and

"[i]n such a case, a federal court may order an evidentiary hearing or otherwise expand the state-

court record only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements."  *Id.* at 1730,

1735, 1740.  The Supreme Court explained that, although it has the power to establish the narrow

exception for establishing cause and prejudice to overcome the procedural default of a trial

counsel ineffective assistance claim as set forth in *Martinez*, it has "no power to redefine when a

prisoner 'has failed to develop the factual basis for a claim in State court proceedings'" due to

the existence of the requirements of § 2254(e)(2). *Id.* at 1736–38.  The Supreme Court

concluded, among other things, that where § 2254(e)(2) applies and the prisoner cannot satisfy

its stringent requirements, "a federal court may not hold an evidentiary hearing—or otherwise

consider new evidence—to assess cause and prejudice under *Martinez*." *Id.* at 1738–39 (relying

on *Holland*, 542 U.S. at 653 and *Williams*, 529 U.S. at 433).

/ / / /

/ / / /

18

**III.    Discussion**

**A.    Procedurally Defaulted Claims—Grounds 1(A–F) and 1(J)**

In these grounds, Madrid asserts trial counsel was ineffective in violation of the Sixth and Fourteenth Amendments.[6] ECF No. 9–9-3.  I previously deferred ruling whether Madrid can demonstrate cause and prejudice under *Martinez* to overcome the procedural default of these claims. ECF No. 41 at 12.  As discussed below, Madrid fails to demonstrate substantial claims of ineffective assistance of trial counsel necessary to overcome the procedural defaults because the resolution of the merits of the claims are not debatable among jurists of reason and the issues are not deserving enough to encourage further pursuit of them.  I will therefore dismiss grounds 1(A)–(F) and 1(J).

**1.    Ground 1(A)—Failure to Present Evidence of Madrid's Stab Injury**

Madrid asserts trial counsel was ineffective in failing to investigate and present medical records and expert testimony concerning his stab wound to (a) refute evidence that he fired the gun that killed R.M; and (b) support an instruction on the lesser-included offense of voluntary manslaughter. ECF No. 9-1 at 18–21.  Madrid fails to demonstrate a substantial claim that trial counsel was ineffective under *Strickland* for purposes of overcoming the procedural default.

In opening remarks to the jury, trial counsel argued the evidence would show Madrid received a stab wound to his forearm that "literally went in one side and out the other side of his right hand" that "rendered the hand useless at that point" and "it makes sense that if he was stabbed before [the shooting], he couldn't have done the shooting." Ex. 24 and ECF No. 25-1 at 27.  At trial, Madrid's medical records were admitted into evidence along with presentation of

---

[6] Madrid had two trial attorneys.  They will be referred to respectively as "lead counsel" and "co-counsel," and collectively as "trial counsel." Ex. 21 and ECF No. 24-1 at 2.

1    scars on his arm. Ex. 30 and ECF No. 26-3 at 12–13.  Madrid testified he is "right-handed," his

2    right arm was stabbed "through and through," and he lost feeling in his right hand such that he

3    was unable to grab his keys to unlock his car just after he was stabbed and was unable to hold a

4    gun. *See supra*, p. 8.

5          At the state postconviction evidentiary hearing, lead trial counsel testified he neither

6    considered nor consciously rejected the prospect of calling the treating physician or a medical

7    expert concerning Madrid's stab injury. Ex. 78 and ECF No. 30-1 at 39–43, 64, 72–73.  Lead

8    counsel agreed it was "fair to say" Madrid's medical records were admitted "in a vacuum," but

9    could not say the records supported a theory that Madrid could not have accurately shot the

10   firearm. *Id.* at 43, 65.  Co-counsel testified that, in retrospect, medical testimony about Madrid's

11   injury would have bolstered a theory that Madrid was unable to accurately shoot a firearm after

12   he was stabbed. *Id.* at 32, 40, 64.

13         Madrid fails to demonstrate a substantial claim that trial counsel's failure to admit his

14   medical records or elicit expert medical testimony about the debilitating nature of Madrid's stab

15   injury was ineffective under Strickland's performance prong.  The defense theory was that

16   someone other than Madrid shot R.M.  Thus, trial counsel ensured Madrid's medical records

17   were admitted into evidence to show Madrid was stabbed.  Counsel further elicited Madrid's

18   testimony that he is right-handed, was stabbed in his right hand, and could not have held a

19   firearm after he was stabbed. Under the totality of the circumstances, it was reasonable for

20   counsel to forego medical expert testimony that would have duplicated Madrid's uncontested

21   testimony that he could not have shot R.M. after he was stabbed. Madrid further fails to

22   demonstrate a substantial claim that counsel's failure to elicit medical testimony about his stab

23   injury to support a voluntary manslaughter instruction was deficient or prejudicial under

*Strickland*.  This claim is closely related to Madrid's claim in ground 1(F) that counsel was ineffective in failing to request a voluntary manslaughter instruction. *See infra*, pp. 33–35.  As discussed below, Madrid fails to establish a substantial claim that trial counsel was ineffective in failing to request a voluntary manslaughter instruction. *Id.*  Madrid likewise fails to establish a substantial claim that counsel was ineffective in failing to present expert medical testimony to support a voluntary manslaughter defense.

### 2.    Ground 1(B)—Failure to Challenge Lineups and Identifications

Madrid claims trial counsel was ineffective in failing to investigate and object to the photographic lineups as suggestive and to in-court identifications of Madrid as unreliable. Madrid asserts he was the only person depicted in the lineups who had attended the party and police asked eyewitnesses whether they recognized anyone in the photographs, not whether they recognized the shooter. ECF No. 9-1 at 21–23.  I dismiss ground 1(B) because Madrid has not overcome the procedural default.

At the state court evidentiary hearing, lead counsel testified he did not hire an expert concerning the identifications. Ex 78 and ECF No. 30-1 at 54, 70–71.  Counsel said it was "possible" he did not hire an expert because he determined there were no issues. *Id.*  Co-counsel testified he could not pinpoint how an expert might have helped but, an expert could have testified about eyewitness reliability in general, as he had never seen a lineup that did not have issues, and there was some suggestibility. *Id.* at 17–18, 31, 38.

To be "'impermissibly suggestive,'" an identification procedure must "'give rise to a very substantial likelihood of irreparable misidentification.'" *Simmons v. United States*, 390 U.S. 377, 384 (1968).  Even when an unnecessarily suggestive procedure is used, "suppression of the resulting identification is not the inevitable consequence." *Perry v. New Hampshire*, 565 U.S.

228, 239 (2012) (citing *Manson v. Brathwaite*, 432 U.S. 98, 112–13 (1977) and *Neil v. Biggers*, 409 U.S. 188, 198–99 (1972)).  Instead, "the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Biggers*, 409 U.S. at 201).  "'[R]eliability [of the eyewitness identification] is the linchpin' of that evaluation." *Id.* (quoting *Brathwaite*, 432 U.S. at 114; alterations in original).  "'Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed  by the corrupting effect' of law enforcement suggestion, the identification should be suppressed.'" *Id.* (citing *Brathwaite*, 432 U.S. at 114, 116.)  "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Id.* (footnote omitted).  The factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation." *Biggers,* 409 U.S. at 119–20.

Although witnesses might have identified Madrid's photograph in the lineup arrays because they recognized him from the party, Madrid fails to show a substantial claim that counsel's failure to object was unreasonable under *Strickland*.  At trial, Madrid, Cervantes, and Detective Collins each testified that Madrid was the only person depicted in the photographic arrays who had attended the party. *See supra,* p. 8; *see also infra*, pp. 18–19.  Collins explained that using photographs of three or four other individuals who attended the party might lead to tainted identifications because the individuals might be recognized based on their presence at the party, and instead, police utilized photographs of individuals who look like the suspect. Ex 26 and ECF No. 25-3 at 39.  Based on Collins's explanation, it was reasonable to conclude the

1  arrays were not unnecessarily suggestive, and it is not enough that the lineup procedure "may

2  have in some respects fallen short of the ideal." *Simmons,* 390 U.S. at 385–86.

3          Madrid has also failed to show a substantial claim that counsel unreasonably failed to

4  object to the reliability of the in-court identifications.  Multiple factors bearing on reliability or

5  unreliability of the identifications were presented to the jury.  The four eyewitnesses testified

6  about their friendship with R.M., that Madrid was a stranger, and their conversations with others

7  who may have influenced their identifications.  The jury was made aware of the possibility that

8  Madrid could have been identified because he was the only partygoer in the photo arrays.

9  Detective Collins testified he never confirmed to any of the eyewitnesses whether they chose the

10  suspect or not. Ex. 26 and ECF No. 25-3 at 24, 26.  Collins said he cautioned Lackey, before he

11  made his identification, to recall the bone structure, features and hair, keeping in mind that hair

12  may be different than when the photograph was taken. *Id.* at 24–25.

13          Lackey testified Collins showed him the photographs "one-by-one" and Lackey identified

14  Madrid as R.M.'s shooter. Ex 25 and ECF No. 25-2 at 36–37.  F.S. testified he first met Madrid

15  at the party, they spoke face to face for a few minutes, and "many people" told him the shooter

16  was a rapper called "Nano." *Id.* at 20, 22–23.  He said he found Nano's photograph on a copy of

17  Nano's CD recording and thought, "yeah, that's him." *Id.*  He said police did not tell him that he

18  was required to select a photograph from the array, did not make any threats or promises, and

19  showed him the photographs "all at once." *Id.* at 15–16, 20.  F.S. said Madrid's photograph

20  looked like the same person depicted on the CD, and he identified Madrid as the shooter. *Id.*

21  Cervantes testified police did not tell him he had to choose one of the photographs in the array

22  and made no promises or threats. *Id.* at 27.  Cervantes agreed no one else whom he saw at the

23  party was depicted in the array. *Id.* at 30.  S.D. also testified police did not tell him he had to

1  choose someone in the array, did not promise or threaten him, and he identified Madrid as the

2  shooter. Ex. 24 and ECF No. 25-1 at 35–36.

3      Madrid fails to demonstrate a substantial claim that counsel performed unreasonably in

4  failing to challenge the in-court identifications as unreliable.

5      Madrid's claim that Detective Collins asked the witnesses to identify anyone whom they

6  recognized in the lineups, as distinct from asking whether they recognized R.M.'s shooter, is

7  belied by the testimony of the eyewitnesses who each said they identified Madrid because they

8  saw him shoot R.M.  Madrid claims that the apprehensiveness of the witnesses who failed to

9  initially identify him supports a claim that the identifications were suggested and unreliable.  But

10  that fact was presented to the jury and cuts both ways, as Cervantes testified that he was afraid to

11  identify Madrid out of fear of retaliation by Madrid's friends. Ex. 25 and ECF No. 25-2 at 27, 29.

12      On this record, Madrid fails to demonstrate a substantial claim that trial counsel's failure

13  to challenge the lineup identifications as suggestive or the in-court identifications as unreliable,

14  was unreasonable under *Strickland*.

15          **3.       Ground 1(C)—Failure to Challenge Rap CD and Song**

16      Madrid alleges trial counsel was ineffective in failing to object to the admission of his rap

17  CD and song "Bullet Holes" as (a) improper character evidence in violation of NRS § 48.045;

18  (b) a prior bad act that is more prejudicial than probative; (c) a violation of his First Amendment

19  rights to freedom of speech; and (d) a violation of his Fifth Amendment rights. ECF No. 9-1 at

20  24–26.  As discussed below, I will dismiss ground 1(C) because Madrid fails to establish a

21  substantial claim of ineffective assistance of trial counsel to overcome the procedural default.

22          **a.       Additional Background for Ground 1(C)**

23

1        At trial and outside the presence of the jury, the State moved to admit Madrid's rap CD

2   and for permission to play to the jury the title song "Bullet Holes." Ex. 29 and ECF No. 26-2 at

3   4.  The State explained the song "starts off with sounds of bullet shots" and "then it has what

4   sounds like a newscaster reporting on the shooting" "[a]nd the newscaster will say: 'A gang-

5   related shooting last night, a teenage boy is dead.'" *Id.* at 8.  The State explained that Madrid is

6   heard laughing and singing, "[w]atch out for the bullet holds sending fragments through your

7   clothes" and "[w]atch your back." *Id.*  The State argued the song is relevant because Madrid

8   "raps about a gang-related drive-by shooting," a .40 millimeter-semi-automatic handgun,

9   "nickel-plated heat," "watching your back," "repetitive gun shots," "gun fragments penetrating

10  clothes," and "killing people." *Id.* at 4–5, 9.  The State argued it "fits right in with the evidence

11  that we have in this case" "[a]nd the "gang expert will testify that these types of rappers do not

12  rap about this kind of stuff unless they're involved with this kind of stuff," as otherwise they are

13  considered a "poser." *Id.*

14       Trial counsel argued the song is "highly prejudicial and only moderately probative

15  because it doesn't have anything to do with shooting anybody at a party, or claiming to shoot

16  anybody at a party, or anything to do with this particular case" and does not contain a confession

17  that Madrid shot someone. *Id.* at 6–7, 9.  Counsel argued the jury "might get the impression that

18  that was a news clip from this crime." *Id.*  Counsel explained the lyrics include "stereotypical

19  stuff that's in rap music," including every "cliché in rap music," i.e., bullets, criminals, drugs,

20  street life, fraud, and drug dealing, and "no expert can testify positively that they don't write

21  these things without doing it[;]"otherwise, "the whole Gramm[y]s would all be in prison." *Id.*

22       The state district court noted the song is "replete with references to gangs" and "part of

23  what the State" must prove is that Madrid "had involvement with a gang that motivated the

25

shooting to enhance the gang." *Id.* at 10.   The court noted the CD was distributed by Gangster

Field Music Group" and asked rhetorically, "[h]ow relevant can anything be?" *Id.*   Trial counsel

countered, "it's not that it's not probative," "[i]t's just that the prejudice extremely outweighs the

probative value when you have an expert and numerous witnesses already talking about gang

involvement and gangs," and "[i]t's just adding a little bit of probative value, but it's adding an

extreme amount of prejudicial value, where the extreme amount of prejudicial value in this case

outweighs the probative value." *Id.*   The state district court said it would agree with the defense

but for the gang charge and admitted the song because "this confirms, if believed by the jury,

that this defendant is very much ensconced in the gang culture." *Id.* at 11–12.

After conviction, Madrid moved for a new trial contending the admission of the song

"Bullet Holes" erroneously permitted character and bad acts evidence and was more prejudicial

than probative in violation of NRS § 48.045 because the State argued the lyrics resembled the

alleged crime. Ex. 40 and ECF No. 28-3 at 4–14.   The state district court denied the motion

finding the song did not suggest bad acts but was instead probative of motive and Madrid's

involvement and familiarity with gangs to satisfy the elements of the gang charge. Ex. 42 and

ECF No. 28-5 at 14–15.   The state district court also determined admission was harmless

because of the overwhelming evidence of guilt and, although the detective said one who raps

about crimes is involved in them, Madrid testified it was a façade to sell records. *Id.* at 15–16.

At the postconviction evidentiary hearing, lead counsel testified he learned about the CD

during trial and did not listen to the CD before it was played for the jury. Ex. 78 and ECF No.

30-1 at 47–48.   Counsel said he tried to demonstrate, using references to other rap songs, that a

rap song does not necessarily convey the rap artist's activities. *Id.* at 69–70.   Co-counsel testified

he knew Madrid was a rap artist who recorded CDs but never imagined "any song to the effect

that I would have asked about" and the CD was a surprise. *Id.* at 12–14.  Co-counsel said the CD

"wasn't a confession or admission in any way shape or form," but counsel saw it as "character

assassination" and could see "how a jury's going to read it as kind of an in-your-face type of

thing," or braggadocious. *Id.* at 14, 29.

**b.      Ground 1(C)(a)–(b)—Bad Act and Character Evidence**[7]

On direct appeal, the Supreme Court of Nevada rejected Madrid's claims that admission

of the CD and song "Bullet Holes" was erroneous:

> At trial, Madrid's only objection to the CD was that its
> prejudice greatly outweighed its probative value.  NRS 48.035
> prohibits the introduction of relevant evidence whose probative
> value is substantially outweighed by the danger of unfair prejudice.
>
> In the song played for the jury, Madrid references various
> crimes, including robberies and drug deals, and generally describes
> gangster life (i.e.[,] possession of various guns and "battles" over
> colors and drugs).  The CD is probative of Madrid's membership
> in a gang and his loyalty to it, as well as his motive and intent,
> especially in conjunction with the testimony of Detective
> Hutchinson [sic] that rappers often live the lifestyle they rap about.
> See People v. Zepeda, 83 Cal. Rptr.3d 793, 801 (Ct. App. 2008).
> Moreover, the CD is not unduly prejudicial as it is unlikely that a
> juror would be overly influenced by the lyrics, despite their violent
> nature.  Accordingly, we agree that the probative value of the CD
> was not substantially outweighed by its potential prejudice.
>
> . . . .
>
> . . . Evidence of a person's character is generally not
> admissible to prove that he acted in conformity with that character
> on a particular occasion. NRS 48.045(1).  Further, "evidence of
> other crimes, wrongs or acts is not admissible to prove the
> character of a person in order to show that he acted in conformity
> therewith." NRS 48.045(2).  However, such evidence may be
> admissible for a purpose not concerning the character of the
> defendant. Id.; Kimberly v. State, 104 Nev. 336, 337, 757 P.2d
> 1326, 1327 (1998).  For example, evidence of other acts may be
> used to show motive, knowledge or identity. Id.  Before such

---

[7] I subdivide certain grounds in this order where appropriate for clarity.

evidence is admitted, the district court must conduct a hearing on the record outside the presence of the jury where it determines that: "(1) the [act] is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." Tinch, 113 Nev. at 1176, 946 P.2d at 1064.

We agree with the district court that the CD is not a prior bad act. As pointed out by Madrid, the CD is merely a form of "creative expression," and cannot be said to constitute an "act." Further, the CD was not introduced as character evidence. Instead, it was used to show Madrid's involvement with and knowledge of gangs in order to prove the gang enhancement. Thus, the district court did not err in failing to hold a hearing pursuant to Tinch.

[FN 3] Madrid also argues that the trial court erred in failing to give a limiting instruction regarding the introduction of the CD. As the CD was not evidence of a prior bad act, no limiting instruction was required. See Tavares v. State, 117 Nev. 725, 731, 30 P.3d 1128, 1132 (2001), holding modified by McLellan v. State, 124 Nev. ___, 182 P.3d 106 (2008). Further, even if a limiting instruction was required, we conclude that any error was harmless. See Johnson v. State, 92 Nev. 405, 407, 551 P.2d 241, 242 (1976).

Moreover, even if a hearing was required, failure to conduct a proper hearing does not mandate reversal if (1) this court can determine from the record that the evidence is admissible under the test set forth in Tinch, or (2) "the result would have been the same if the trial court had not admitted the evidence." Qualls v. State, 114 Nev. 990, 903-04, 961 P.2d 765, 767 (1998). Both of these facts are met here. First, the Tinch test is satisfied because the CD is relevant to show Madrid's involvement with and knowledge of gangs, Madrid admits that he sang the lyrics to the song "Bullet Holes," and, as discussed above, the probative value of the CD exceeds its prejudice. Thus, under Tinch, the CD is admissible. And exclusion of the CD would not have resulted in a different result at trial. The State introduced substantial evidence proving Madrid's involvement with gangs including: photos of Madrid posing with other gang members and "flashing" gang hand signs; a photo of Madrid with a spray can in his hand in front of gang graffiti; police records identifying him as a gang associate; and a second CD, sung entirely by Madrid, containing songs referencing gang life and killing people. In light of this evidence,

28

we conclude that the district court did not abuse its discretion in
denying Madrid's motion for a new trial.

> [FN 4] Alternatively, Madrid argues that the CD
> itself was not the bad act, but instead was evidence
> of various bad acts referenced in the lyrics.  The
> district court concluded that the CD was not
> evidence of prior bad acts but helped establish
> motive and gang involvement.  We conclude that
> the trial court did not abuse its discretion in denying
> the motion for new trial on this basis.  See U.S. v.
> Stuckey, 253 Fed. Appx. 468, 482-83 (6th Cir.
> 2007) (holding that the district court did not abuse
> its discretion in determining that rap lyrics sung by
> a defendant were not evidence of a prior bad act)
> cert. denied, ___ U.S. ___, 128 S. Ct. 2979 (2008).

Ex. 63 and ECF No. 28-26 at 2–8.

Madrid fails to show a substantial claim that trial counsel's failure to object to the

admission of the CD on the bases set forth in ground 1(C)(a)–(c) constitutes deficient or

prejudicial performance under *Strickland*.  The Supreme Court of Nevada ruled that they were

not inadmissible prior bad act or character evidence, the probative value was not substantially

outweighed by the prejudicial effect, and a limiting instruction was not warranted.

### c.    Ground 1(C)(c)—First Amendment Freedom of Speech

"Music, as a form of expression and communication, is protected under the First

Amendment." *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989).  But the First

Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime

or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).[8]  In *Carpenter*,

---

[8] *See also, Duncan v. City of San Diego*, 401 F. Supp. 3d 1016, 1037–38 (S.D. Cal. 2019)
(recognizing rap music may be introduced in criminal trials as speech probative of state of mind
and motive for purposes of gang enhancements); *United States v. Carpenter*, 372 F. Supp. 3d 74,
78 (E.D.N.Y. 2019) (holding admission of the defendant's rap lyrics and music videos would not
violate First Amendment right to free expression because lyrics and videos not admitted to

1    the court rejected defendant's "attempts to use Bob Marley's 'I Shot the Sheriff' and Johnny

2    Cash's 'I Shot a Man in Reno' as examples of fictional work that would be irrelevant in a

3    criminal trial and a threat to an author's artistic expression," as those songs would only support a

4    claim that such lyrics are inadmissible as irrelevant if Bob Marley or Johnny Cash were on trial

5    for circumstances that were not directly related to either act described in their music. *Carpenter*,

6    372 F. Supp. 3d at 78.

7           The amended information charged Madrid with murder with the use of a deadly weapon

8    with the intent to promote, further, or assist a criminal gang, and specifically that he did so

9    "wil[l]fully, unlawfully, feloniously, and knowingly, for the benefit of, at the direction of, or in

10   affiliation with, a criminal gang, to-wit: 'Los Hermanos,' . . . ." Ex. 31 and ECF No. 27-1 at 2.

11   The information further alleged Madrid killed R.M. "with specific intent to promote, further, or

12   assist the activities of the above-said gang . . . ." *Id.* at 2–3.  The state district court admitted the

13   CD as relevant and more probative than prejudicial to prove involvement with gangs and

14   motivation for the shooting for purposes of establishing the gang enhancement.  The lyrics of

15   "Bullet Holes" include references to circumstances similar to the charged crime, the type of

16   weapon used to kill R.M., and are sympathetic to gangs. *See supra*, n.4.

17          As the song was relevant and admitted for the purpose of proving the charged gang

18   enhancement, Madrid fails to show a substantial claim that trial counsel's performance in failing

19

20   portray defendant as "morally reprehensible" but to prove the charged crimes); *People v. Zepeda*,
     167 Cal. App. 4th 25, 35 (2008) (holding lyrics were probative of defendant's state of mind and
21   criminal intent, his membership in gang and loyalty to it, and his motive and intent to kill
     opposing gang members, for purposes of gang enhancement and were not unduly prejudicial);
22   *People v. Olguin*, 31 Cal. App. 4th 1355, 1372–1373 (1994) (holding trial court properly
     admitted rap lyrics written by defendant that demonstrated his membership in a gang, his loyalty
23   to it, his familiarity with gang culture and, inferentially, his motive and intent on the day of the
     killing, over objection that the lyrics were more prejudicial than probative).

1 to object to admission of the CD as a violation of the First Amendment was deficient or

2 prejudicial under *Strickland*.

3         **d.**       **Ground 1(C)(d)—Fifth Amendment Privilege**

4       The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal

5 case to be a witness against himself . . . ." U.S. CONST. amend. V.  To receive Fifth Amendment

6 protection, a person's statement or act must (1) be compelled; (2) be testimonial; and

7 (3) incriminate the person in a criminal proceeding. *Fisher v. U.S.*, 425 U.S. 391, 409 (1976).

8       The state court record in Madrid's case in no way suggests the CD or the song "Bullet

9 Holes" were the products of custodial interrogation; that government agents compelled Madrid to

10 write the lyrics, sing the song, or produce the CD; or that the lyrics were testimonial.  Madrid

11 admitted he wrote the song "Bullet Holes," which includes facts similar to the crime with which

12 he was charged and sang the song for the production of his CD sometime after the shooting. *See*

13 *In re Grand Jury Proceedings*, 759 F.2d 1418, 1419 (9th Cir. 1985) (Fifth Amendment does not

14 protect the contents of voluntarily prepared documents, whether business or personal).  F.S.

15 testified he obtained a copy of the CD at a swap meet, so the CD was commercially available.

16 Ex. 25 and ECF No. 25-2 at 20.

17       Madrid fails to show a substantial claim that counsel's failure to object to the admission

18 of the CD and song as a violation of the Fifth Amendment was deficient or prejudicial under

19 *Strickland*.

20

21         **4.**       **Ground 1(D)—Failure to Challenge the State's use of Field Interview and Booking Sheets and Uncharged Acts**

22

23       Madrid asserts trial counsel was ineffective in failing to object to introduction of field

interview sheets and statements Madrid made when he was booked into jail on the grounds they

lacked proper chain of custody and foundation, were not authenticated, were hearsay, constituted

fugitive documents, were obtained in violation of the Fourth and Fifth Amendments protections

against juvenile confessions, and were inadmissible character evidence, and because counsel

failed to request a limiting instruction on the use of that evidence. ECF No. 9-1 at 25–28.

Madrid further alleges trial counsel was ineffective in failing to object to Detective Hutchison's

testimony about prior uncharged bad acts. *Id.*  For the reasons discussed below, I will dismiss

ground 1(D) as Madrid has not established a substantial claim of ineffective assistance of trial

counsel and therefore fails to overcome the procedural default of these claims.

### a.  Ground 1(D)(a)—Field Interview and Booking Sheets

The State sought to impeach Madrid's denial of gang membership by showing him two

field interview sheets in which he was a documented gang member. *See supra*, p. 9.  Neither

field interview sheet was admitted into evidence, but Madrid's booking information sheet was

admitted over a hearsay objection. Ex. 30 and ECF No. 26-3 at 62.  At the state postconviction

evidentiary hearing, co-counsel testified he "anticipated" the field contact sheets would come

into evidence because he knew about them. Ex. 78 and ECF No. 30-1 at 24–25.  Co-counsel

admitted that "in hindsight" he saw a problem with admitting the sheets but explained "I think

the idea, again, was just to—it was going to get in and it was a matter of not drawing attention to

it and showing Mariano as not being a gang member." *Id.*

Madrid fails to demonstrate a substantial claim that trial counsel was ineffective under

*Strickland's* prejudice prong because even if Madrid could demonstrate trial counsel

unreasonably failed to object to the use of the field interview cards and booking information

sheet, he cannot demonstrate a reasonable probability the result of the proceedings would have

been different had counsel done so.  Madrid denied gang membership, but admitted he had

1  numerous gang associations, including family members who were Los Hermanos gang members

2  and that he is a rap artist whose songs are about gang life.  Hutchison read to the jury Madrid's

3  "gangsters only" rap CD pamphlet which includes "shout outs" to Los Hermanos and other

4  gangs.  *Id.* at 61–62.  Madrid's song "Bullet Holes," which he composed after the shooting and

5  in which he raps about the shooting of a teenage boy in a gang-related incident, was played for

6  the jury.  According to Hutchison, the party took place in Los Hermanos gang territory and

7  eyewitnesses testified they saw and heard Madrid say "Los Hermanos," "LH, LAH" or

8  "Henderson side" and make a hand gesture just before they saw him obtain a firearm and shoot

9  R.M.  S.D. testified he heard Madrid say "Los Hermanos" as he shot R.M.  Hutchison further

10  testified Madrid is a documented Los Hermanos gang member and identified photographs

11  depicting Madrid throwing up the "L" and "H" for Los Hermanos, and a "W" for West Side.

12       Madrid fails to make a substantial claim that there was any reasonable probability the

13  result of the proceedings would have been different had counsel objected to the State's use of the

14  field sheets and booking information concerning Madrid's gang membership and affiliations.

15  / / / /

16  / / / /

17  / / / /

18  / / / /

19       **b.      Ground 1(D)(b)— Uncharged Acts[9]**

20       At trial, Detective Hutchison testified on cross-examination that he was aware Madrid

21  had no felony convictions but volunteered he was aware of two reports that Madrid committed

22

23
_____

[9] The respondents did not answer this allegation in their answer to the petition.  *See* ECF No. 49 at 33–35.

battery with use of a deadly weapon (i.e., a firearm), although Hutchison did not know if Madrid was arrested for either incident. Ex. 29 and ECF No. 26-2 at 104–05.  On redirect, Hutchison said he believed Madrid was accused of pointing a firearm during a road rage incident but the victim was afraid to prosecute. *Id.* at 109.  Hutchison said he could not recall the details of the second incident but believed it was gun-related and not fully investigated. *Id.*

Madrid explained in his trial testimony that the first uncharged incident involved a man on the freeway who told police he pointed a firearm at him, but Madrid maintained that was "totally false" and no charges were filed. Ex. 30 and ECF No. 26-3 at 46–47.  Madrid explained that a man cut him off on the road, and when he continued to drive, the man rolled down his window, flipped him off, and yelled at him. *Id.*  Madrid said he grabbed a CD case cover, not a firearm, and pointed it at the man. *Id.*  Madrid explained the second incident involved his ex-girlfriend who complained about domestic violence to the police for which he was not prosecuted after he showed the detective his ex-girlfriend's text message stating he was going to pay the price for breaking up with her. *Id.* at 45–46.  At the state postconviction evidentiary hearing, lead counsel agreed he should have objected to Hutchison's testimony about the uncharged acts as nonresponsive and speculative and should have moved to strike Hutchison's testimony. Ex. 78 and ECF No. 30-1 at 52–54, 74–75.

/ / / /

According to NRS § 48.045(2):

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The Supreme Court has stated:

> The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice. (Footnotes omitted).

*Michelson v. United States*, 335 U.S. 469, 475–76 (1948).[10]

Detective Hutchison improperly volunteered testimony about Madrid's prior uncharged encounters with law enforcement in response to trial counsel's cross-examination into whether Madrid had any prior felony convictions. And the State improperly followed up with detailed cross-examination about those uncharged acts. Madrid presents a substantial claim that counsel performed deficiently by failing to object and move to strike Hutchison's testimony about the prior uncharged bad acts. But Madrid fails to demonstrate a substantial claim that, but for trial counsel's failure to object and move to strike the improper testimony, there is a reasonable probability the result of the proceedings would have been different. Four eyewitnesses testified they saw Madrid shoot R.M. Forensic analysts determined there was gunshot residue on Madrid's clothing and in his vehicle. Witnesses testified they heard Madrid invoke the Los Hermanos gang and make a hand signal just prior to shooting R.M. And there was ample

---

[10] *See also, Tavares v. State*, 117 Nev. 725, 730, 30 P.3d 1128, 1131 (2001) ("We have often held that the use of uncharged bad act evidence to convict a defendant is heavily disfavored in our criminal justice system because bad acts are often irrelevant and prejudicial and force the accused to defend against vague and unsubstantiated charges" and "[t]he principal concern with admitting such acts is that the jury will be unduly influenced by the evidence, and thus convict the accused because it believes the accused is a bad person.").

1  evidence of Madrid's gang allegiances and that he participated in a confrontation between

2  members of other gangs just before the shooting.

3  Based on the overwhelming evidence, Madrid fails to demonstrate a substantial claim of

4  ineffective assistance of counsel to overcome the procedural default of this claim.

### 5. Ground 1(E)—Failure to Object to Photograph of Firearms

6  Madrid claims trial counsel was ineffective in failing to object to demonstrative

7  photographs of .40 caliber handguns as false evidence in violation of due process because they

8  did not depict the actual murder weapon. ECF No. 9-1 at 28–31.

9  The State's forensic firearms expert, Krylo, testified he did not receive a firearm for

10  forensic analysis. Ex. 29 and 26-2 at 42.  The State introduced, through Krylo's testimony,

11  photographs depicting common examples of semiautomatic firearms that, in Krylo's opinion,

12  may have fired the .40 caliber spent bullet cartridges and bullet found at the scene of the

13  shooting. *Id.* at 25–30.  The State moved to admit those photographs into evidence, and trial

14  counsel objected unless the photographs were used exclusively for demonstrative purposes. *Id.* at

15  27–30.  The state district court admitted the photographs only for that purpose. *Id.*  Krylo

16  testified the weapon used in this case was not necessarily limited to the semiautomatic pistols

17  depicted in the demonstrative photographs; rather, firearms from a variety of manufacturers

18  could have fired the bullet and expended the cartridges found at the scene. *Id.* at 37–42.

19  At the postconviction evidentiary hearing, lead counsel agreed he could have objected

20  that the photographs of the firearms were irrelevant and more prejudicial than probative, and he

21  could have asked for a limiting instruction directing the jury not to consider any of the depicted

22  firearms as the murder weapon. Ex. 78 and ECF No. 30-1 at 49–50, 73–76.

23

Madrid fails to demonstrate a substantial claim that trial counsel's performance was deficient or prejudicial under *Strickland*.  Trial counsel objected to admission of the photographs unless they were used strictly for demonstrative purposes.  Counsel's objection and qualification of the use of the exhibit and the state district court's consent to that limitation were expressed in the jury's presence.  Thus, no limiting instruction was warranted.  Krylo never stated the photographs depicted the actual firearm used to shoot R.M, or to expend the bullet and cartridges found at the scene.  Instead, Krylo used the photographs to demonstrate how to operate semiautomatic firearms, how they produce markings similar to the markings on the items he examined from the scene, and to depict common models of .40 caliber firearms that might have shot the bullet or expended the casings found at the scene.  Krylo did not opine which, or whether, any of the firearms depicted in the photographs was the murder weapon or its equivalent.  Rather, Krylo testified the shooter could have used a semiautomatic firearm manufactured by a different company than those depicted in the demonstrative exhibit.  For these reasons, I find Madrid cannot overcome the procedural default for this claim.

**6.    Ground 1(F)—Failure to Request Instruction on Voluntary Manslaughter**

Madrid alleges trial counsel was ineffective in failing to request an instruction permitting the jury to consider the lesser-included offense of voluntary manslaughter. ECF No. 9-1 at 31–40.  I will dismiss ground 1(F) because Madrid fails to overcome the procedural default.

Voluntary manslaughter "[c]onsists of a killing which is the result of a sudden, violent and irresistible impulse of passion[;] [t]he law requires that the irresistible impulse of passion be caused by a serious and highly provoking injury, or attempted injury, sufficient to excite such passion in a reasonable person." NRS § 200.050; *Allen v. State*, 98 Nev. 354, 356–57, 647 P.2d

389, 390–91 (1982).  "A defendant in a criminal case is entitled, upon request, to a jury instruction on his theory of the case so long as there is some evidence, no matter how weak or incredible, to support it." *Williams v. State*, 99 Nev. 530, 531, 665 P.2d 260, 261 (1983) (citations omitted).

At the postconviction evidentiary hearing, lead counsel testified the defense theory was that Madrid was in close proximity to the shooter when the gun discharged but was not the shooter. Ex. 78 and ECF No. 30-1 at 59, 62.  Counsel believed the State's theory was that Madrid shot somebody "to promote the gang," and counsel disagreed that the State's theory was Madrid was motivated to shoot because he was stabbed. *Id.* at 61–62.  Co-counsel testified the defense theory was someone else shot R.M., Madrid "was unable to do it," and the State failed to meet its burden of proof, although co-counsel was of the opinion that the latter can sometimes "be a risky proposition." *Id.* at 21–22, 27.  Co-counsel testified a self-defense theory would have undercut the defense that someone else shot R.M. and would have been contradicted by Madrid's testimony that he did not shoot R.M. and was unable to do so. *Id.* at 32.

Trial counsel's failure to pursue a voluntary manslaughter theory was reasonable because doing so would have been inconsistent with Madrid's testimony, and the overall defense theory, that Madrid did not shoot R.M. and had never handled a firearm. *See,* e.g., *United States v. Stern*, 519 F.2d 521, 525 (9th Cir. 1975) (holding counsels' failure to pursue inconsistent defenses did not constitute ineffective assistance).  As with co-counsel's testimony that a self-defense theory was rejected because Madrid testified that he did not shoot R.M., Madrid's testimony that he did not shoot R.M. negates a necessary element for a voluntary manslaughter defense.

Madrid also fails to show a substantial claim that counsel's failure to request a voluntary manslaughter instruction was deficient or prejudicial under *Strickland* because no evidence in the

1  state court record supports the instruction.  Contrary to Madrid's assertion (ECF No 9-1 at 20),

2  Cervantes did not testify that Madrid was stabbed before R.M. was shot; rather, Cervantes

3  testified he did not see Madrid get stabbed. *See supra,* pp. 3–4.  Cervantes also testified he saw

4  R.M. pull out a knife *after* the shooting began and did not see what R.M. did with the knife. *Id.*

5  No one said they saw Madrid get stabbed except Duron, who claimed he heard gunshots "when"

6  he saw Madrid get stabbed and ran to help him, but also said he did not see Madrid shoot a

7  gun.[11]

8         In his third state postconviction petition, and in support of his petition here, Madrid

9  submitted a portion of a report that indicates Cervantes may have told police he saw R.M. chase

10  Madrid with a knife while Madrid ran to his car and that Madrid retrieved a gun from the car and

11  shot R.M. Ex. 107 and ECF No. 33-6 at 15; *see also* ECF No. 9-2 at 31.  The report indicates

12  that, contrary to Cervantes's trial testimony, he told police he saw R.M. stab Madrid. *Id.*

13        As stated previously, the Supreme Court has indicated I may not consider documents that

14  were not developed during the state court proceedings in accordance with state court procedure

15  unless the requirements of 28 U.S.C. § 2254(e)(2) are met. *See supra*, pp. 14–15.  I see nothing

16  in the record demonstrating the police report was admitted at trial or presented to the state courts

17  in accordance with state court procedures, as the report was presented as part of Madrid's third

18  postconviction relief petition that was deemed untimely and successive.  The presentation of a

19  claim in a procedural context in which the merits of the claim will not be considered, or will be

20  considered only in special circumstances, does not constitute fair presentation of the claim. *See,*

21  *e.g., Castille v. Peoples*, 489 U.S. 346, 351–52 (1989).  The report indicates it was printed on

22

23

[11] Although the State argued in closing that the stabbing provided a motive for the shooting, that argument was belied by testimony—including Madrid's—that gunshots were fired and R.M. was shot before R.M. pulled out a knife and before Madrid was stabbed. *See* Ex. 33 and ECF No. 27-3 at 86.

May 5, 2005, and therefore could have been previously discovered through the exercise of due diligence during Madrid's initial state postconviction proceedings.  Thus, I may not consider the report as Madrid cannot meet the requirements of 28 U.S.C. § 2254(e)(2).

### 7.    Ground 1(J) —Failure to Request Intoxication Instruction

Madrid contends trial counsel was ineffective in failing to request an instruction permitting the jury to consider his intoxication when determining whether Madrid harbored the requisite specific intent required for a murder conviction. ECF No. 9-1 at 52–56.  I will dismiss ground 1(J) because Madrid fails to overcome the procedural default of this claim.

According to NRS § 193.220:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of the person's intoxication may be taken into consideration in determining the purpose, motive or intent.

An instruction on voluntary intoxication is only warranted where there is some evidence in support of a defense theory of intoxication; it is not enough to show alcohol or drug consumption. *Nevius v. State*, 101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985) (finding no instruction warranted because although there was evidence of alcohol and marijuana consumption, there was no evidence that the defendant was intoxicated at the time of the killing) (citing *e.g., Williams v. State,* 99 Nev. 530, 665 P.2d 260 (1983)).  The Supreme Court of Nevada has held that "[i]n order for a defendant to obtain an instruction on voluntary intoxication as negating specific intent, the evidence must show not only the defendant's consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings." *Id.* (citations omitted).

1    Madrid submitted his medical records with his third state postconviction petition and in

2   support of the petition here. Ex. 107 and ECF No. 33-6 at 23–31; *see also* ECF No. 9-2 at 39–47.

3   In this instance, I may consider the medical records in determining whether Madrid has

4   overcome the procedural default because they were admitted at trial and were therefore part of

5   the state court record at the time of Madrid's initial postconviction evidentiary proceedings. Ex

6   23 and ECF No. 24-3 at 16; Ex. 30 and ECF No. 26-3 at 12–13.

7    Nonetheless, Madrid fails to demonstrate a substantial claim that trial counsel

8   unreasonably failed to request an intoxication instruction.  Madrid testified he had been drinking

9   alcohol and smoking marijuana on the night of the shooting.  His medical records demonstrate he

10  informed medical personnel he smoked "weed" and drank alcohol. Ex. 107 and ECF No. 33-6 at

11  23–31.  Madrid's medical records indicate "labs drawn," but do not include a toxicology report

12  and do not suggest Madrid was intoxicated when he arrived at the hospital. *Id.*  Likewise, there

13  was trial testimony that Madrid drank and smoked, but none that he was intoxicated.  Because

14  nothing in the state court record demonstrates Madrid was intoxicated, or that his consumption of

15  alcohol and marijuana had an intoxicating effect on his mental state at the time of the shooting,

16  Madrid fails to demonstrate a substantial claim that counsel's failure to request an intoxication

17  instruction fell below a standard of reasonableness.

18    In his third state postconviction court petition for writ of habeas corpus, and in support of

19  his petition here, Madrid submitted affidavits of Brent Dowl and David Foley, Jr. to support his

20  claim regarding an instruction on intoxication. *Id.* at 17–21; *see also* ECF No. 9-2 at 33–37.  I

21  cannot consider these records because they were not developed in state court in accordance with

22  state court procedures and Madrid has not satisfied the requirements of 28 U.S.C. § 2254(e)(2)

23  by demonstrating the affidavits could not have been discovered through the exercise of due

1 diligence during the initial state postconviction proceedings. *See Ramirez*, 142 S. Ct. at 1735; *see*

2 *also Holland v. Jackson*, 542 U.S. 649, 653 (2004) (prisoner required to meet the conditions of

3 § 2254(e)(2) when prisoner presented a new impeachment testimony and claimed he belatedly

4 discovered the witness because state postconviction counsel did not heed his pleas for

5 assistance). Even if I could consider the affidavits, they do not establish Madrid was intoxicated

6 at the time of the shooting.

7     **B.**     **Grounds Containing Defaulted Claims—1(G) & 1(H)**

8     Grounds 1(G) and 1(H) contain claims that are exhausted and others that are unexhausted

9 and procedurally defaulted, subject to Madrid's ability to overcome the procedural default under

10 *Martinez*. For the reasons discussed below, I will deny federal habeas corpus relief for the

11 exhausted portions and dismiss with prejudice the procedurally defaulted portions because

12 Madrid has failed to show that resolution of the merits of the defaulted ineffective assistance of

13 counsel claims are debatable among jurists of reason and that the issues are deserving enough to

14 encourage further pursuit of them.

15     **1.**     **Treatment of Procedurally Defaulted Claims**

16     Under 28 U.S.C. § 2254(b)(1)(A), a habeas petitioner must exhaust state court remedies

17 on a claim before presenting that claim to a federal court. The exhaustion requirement ensures

18 the state courts, as a matter of federal-state comity, have the first opportunity to pass upon and

19 correct alleged violations of federal constitutional guarantees. *See Coleman*, 501 U.S. at 731. "A

20 petitioner has exhausted his federal claims when he has fully and fairly presented them to the

21 state courts." *Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014) (citing *O'Sullivan v.*

22 *Boerckel*, 526 U.S. 838, 848–49 (1999) ("Section 2254(c) requires only that state prisoners give

23 state courts a *fair* opportunity to act on their claims.")). The presentation of a claim in a

1  procedural context in which the merits will not be considered, or will be considered only in

2  special circumstances, does not constitute fair presentation of the claim. *See, e.g., Castille*, 489

3  U.S. at 351–52.

4          A federal court need not dismiss an unexhausted claim if it is clear that the state court

5  would find the claim procedurally barred. *Coleman*, 501 U.S. at 731; *see also Castille*, 489 U.S.

6  at  351–52; *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) ("An unexhausted claim will

7  be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing

8  the claim in state court."); *Sandgathe v. Maass*, 314 F.3d 371, 376 (9th Cir. 2002) ("When a

9  defendant's claim is procedurally defaulted, either the state court was presented with the claim

10  but "declined to reach the issue for procedural reasons," or "it is clear that the state court would

11  hold the claim procedurally barred.").  As discussed, where a petitioner "has defaulted his federal

12  claims in state court pursuant to an independent and adequate state procedural rule," federal

13  habeas corpus review "is barred unless the prisoner can demonstrate cause for the default and

14  actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to

15  consider the claims will result in a fundamental miscarriage of justice." *See supra*, p. 15.

16          With one exception, Nevada's cause and prejudice standards are functionally identical to

17  the federal standards for cause and prejudice. *Robinson v. Ignacio*, 360 F.3d 1044, 1052 n.3 (9th

18  Cir. 2004); *Mitchell v. State*, 122 Nev. 1269, 1273–74, 149 P.3d 33, 35–36 (2006).  That

19  exception is for a procedurally defaulted claim of ineffective assistance of trial counsel when the

20  cause for the default is the ineffective assistance or absence of postconviction counsel in the

21  initial postconviction proceedings in accordance with *Martinez*. *Brown v. McDaniel*, 130 Nev.

22  565, 571–76, 331 P.3d 867, 871–75 (2014).  A Nevada federal habeas petitioner who relies on

23  *Martinez*—and only *Martinez*—as a basis for overcoming a state procedural bar can successfully

argue that the state courts would hold the claim procedurally barred, but that he nonetheless has a potentially viable argument for cause and prejudice under federal law.

Grounds 1(G) and 1(H) contain claims that were not exhausted in state court proceedings. Based on the state court rulings in Madrid's second and third state postconviction actions, he would face multiple procedural bars if he were to return to state court with the unexhausted claims. *See, e.g.*, NRS §§ 34.726; 34.810.  I may consider the unexhausted claims technically exhausted, but subject to procedural default. *See Dickens*, 740 F.3d at 1317.

"Prisoner *pro se* pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) ("A document filed pro se is to be liberally construed").  "However, in construing *pro se* petitions liberally, the petitioner is not entitled to the benefit of every conceivable doubt; the court is obligated to draw only reasonable factual inferences in the petitioner's favor." *Porter*, 620 F.3d at 958 (citing *McKinney v. De Bord*, 507 F.2d 501, 504 (9th Cir. 1974)).

Liberal construction of Madrid's *pro se* reply in support of his petition indicates he alleges he can overcome the procedural default of unexhausted claims in grounds 1(G) and 1(H) under *Martinez*.  For instance, Madrid refers to *Martinez*'s substantiality requirement for grounds 1(G) and 1(H) and argues trial and postconviction counsel were ineffective. ECF No. 52 at 63, 66–77, 100, 107.  I therefore read Madrid's reply as a concession that the only basis for cause to overcome his failure to present any procedurally defaulted claims contained in grounds 1(G) and 1(H) is *Martinez*.  Because Madrid contends that he can overcome the procedural default under *Martinez*, any claims in grounds 1(G) and 1(H) that were not fully and fairly presented to the state courts during his initial postconviction proceedings are technically exhausted and procedurally defaulted, subject to Madrid's ability to overcome the default under *Martinez*.

1
2

    **2.**    **Ground 1(G)—Failure to Investigate and Impeach Witnesses, Adequately Interview Madrid, and Consult a Crime Scene Reconstructionist**

3    Madrid alleges trial counsel was ineffective in failing to (a) hire an investigator;

4 (b) interview witnesses B.D., Duron, D.F., C.H., H.M., and witnesses provided by Madrid's

5 family; and (c) impeach the State's witnesses with photographs of some of them flashing gang

6 signs and holding weapons. ECF No. 9-1 at 41–45.  Madrid further alleges in his reply brief in

7 support of his petition that counsel was ineffective in failing to interview and present four

8 witnesses.  He relies on affidavits filed as exhibits to his reply brief stating that Madrid was not

9 the shooter, and that a person who is now deceased was the shooter.  Madrid additionally claims

10 trial counsel was ineffective in failing to (e) adequately interview Madrid and (f) consult or hire a

11 crime scene reconstructionist. *Id.*  I will deny federal habeas relief for the claims in ground

12 1(G)(a) –(c), (e), and dismiss as procedurally defaulted the claims in ground 1(G)(d) and (f).

13        **a.**    **Additional Background for Ground 1(G)**

14    Madrid was arrested in June of 2005. Ex. 26 and ECF No. 25-3 at 22.  In April of 2006,

15 trial counsel moved for a trial continuance because counsel had not received discovery of

16 "several tapes involving witnesses" whose names were undisclosed and counsel was unable to

17 locate witnesses. Ex 8 and ECF No. 23-4 at 4.  In February 2007, trial counsel filed a notice of

18 intent to call witnesses Duron, D.A., D.S., G.E., I.A., and O.J., and indicated counsel was still

19 searching for some of their current addresses or telephone numbers. Ex 14 and ECF No. 23-10 at

20 3–4; Ex. 20 and ECF No. 23-16 at 2.  Trial counsel also noticed the unavailability of Lorne

21 Moon, former investigator with the Office of the Coroner, who prepared a report concerning the

22 potential for compromised trace evidence. Ex 16 and ECF No. 23-12 at 8; Ex. 17 and ECF No.

23 23-13.  Just before trial, trial counsel estimated the defense would call "[s]even to ten witnesses,"

including one from "out of state," and confirmed witnesses were available or would be available for trial. Ex. 18 and ECF No. 23-14 at 4.  The defense subpoenaed J.O., but J.O. did not testify at trial. Ex. 19 and ECF No. 23-15 at 2.  During trial, the State received seven transcripts of witness interviews from police and provided them to the defense noting the witness names were previously disclosed in police reports. Ex. 4 and ECF No. 22-4 at 9; Ex. 26 and ECF No. 25-3 at 3–4.  Trial counsel stated the defense would review the interview transcripts and were "experienced enough to know" what they could do with them. Ex. 26 and ECF No. 25-3 at 4.  At trial, counsel called Madrid, Duron, and gunshot residue expert Schwoeble to testify. Ex. 78 and ECF No. 30-1 at 55.

At the state postconviction evidentiary hearing, private investigator Michael Karstedt testified that, for purposes of postconviction proceedings, he interviewed 23-to-25 witnesses who had been disclosed to trial counsel. Ex. 77 and ECF No. 29-12 at 81–85.  Karstedt said some of the witnesses refused to cooperate and of those interviewed, "a large part didn't have valuable enough information to provide" and "[t]hey didn't see anything." *Id.*

Renee Madrid testified at the postconviction evidentiary hearing that she provided trial counsel with photographs from Lackey's MySpace page in which he is depicted throwing gang signs and holding a sawed-off shotgun with eight shells, as well as similar photographs of Cervantes and F.S. *Id.* at 6, 12–26.  Renee claimed the photograph contradicted Lackey's preliminary hearing testimony that he was not a gang member and that F.S. was depicted in the photographs too, but none of the photographs were used to impeach them at trial. *Id.*

Lead trial counsel testified he did not recall why he did not hire an investigator but said he personally spoke with 15-to-20 witnesses, including D.F., Duron, and Lackey. Ex. 78 and ECF No. 30-1 at 44–47, 55–58, 72.  Counsel testified he saw photographs of Lackey and others

throwing gang signs and holding weapons before trial but did not use them to impeach the State's witnesses because "we really wanted to minimize the potential gang testimony" and "gang activity." *Id.* at 43–46.  Co-counsel testified he reviewed "upwards of 30" witness statements to prepare cross-examination but did not develop witnesses for the defense or hire an investigator. *Id.* at 7–9, 28.  Co-counsel said he did not think it was "helpful" to impeach Lackey with the photographs demonstrating Lackey flashing gang signs and holding a shotgun because it would have highlighted "just the nature of it being a gang party, a gang fight, gang issue" and "it just seemed like the more gang pictures and references the worse it was" but later agreed it could have been useful. *Id.* at 29, 36–37.

Madrid's mother, Renee Madrid, testified at the postconviction evidentiary hearing that she provided witness contact information to trial counsel for B.S., D.F., I.M., and R.M., but none of them were contacted or called to testify. Ex. 77 and ECF No. 29-12 at 11–12.  Of those, trial counsel stated he contacted D.F., who testified at trial.  In contrast with his trial testimony, D.F. testified at the postconviction evidentiary hearing that when he left the party, he walked to his car and ran from "some dude holding a gun" and heard gunfire "probably about the same time" that he saw Madrid entering his vehicle. *Id.* at 46, 48, 51.  D.F. did not know Madrid to be a gang member or have a handgun and would be surprised to learn of photographs depicting Madrid flashing Los Hermanos gang signs. *Id.* at 41–45, 53–54.

Renee Madrid did not testify that she alerted trial counsel to potential witnesses B.D., C.D., and H.M, and none of them testified at trial; however, each testified at the postconviction evidentiary hearing.  B.D. testified he was not at the party the night of the shooting, never saw Madrid with a handgun, and to the best of his knowledge Madrid was not a gang member. *Id.* at 37–38.  C.H. testified he was at the party, heard gunfire, did not see Madrid with a gun, did not

1  see the shooting or the stabbing, and gave a statement to police. *Id.* at 28–34.  B.D. and C.H.

2  each testified they never knew Madrid to be a gang member or to possess a firearm and would be

3  surprised to learn of photographs depicting Madrid flashing Los Hermanos gang signs, although

4  they were aware Madrid had family members who belong to that gang. *Id.* at 31, 34–35, 40–41.

5  H.M. was at the party and heard gunfire but did not see the shooter. *Id.* at 74–81.

6       Ernest Duron, who testified at trial, testified at the postconviction evidentiary hearing that

7  he was the person who started the fight at the party because he saw someone "reaching for

8  something in his waistband" and "punched him in the face" and then Duron ran down the street.

9  *Id.* at 55, 60–63.  Unlike at trial, Duron testified the man he punched chased him but then ran

10  toward Madrid and stabbed him with a long black weapon that looked like a shank or knife. *Id.* at

11  63–65, 72–73.  Duron claimed he heard gunshots *after* Madrid was stabbed and chased the

12  stabber until he heard someone say, "he's packing," whereupon he and Madrid crouched down.

13  *Id.* at 65–66.  Duron said he would have known if Madrid had fired shots because Madrid was

14  near him, but the shots did not come from Madrid and seemed to come from behind Duron. *Id.*

15  Duron said he ran until he jumped in D.F.'s vehicle leaving Madrid. *Id.* at 66–67.  Duron said he

16  never knew Madrid to have a weapon, that Madrid is "not part of a gang because he's with me

17  most of the time," and it would surprise him to learn Madrid was affiliated with the Los

18  Hermanos gang. *Id.* at 59, 72.

19       **b.    State Court's Determinations for Ground 1(G)(a)–(c)**

20       In Madrid's appeal from the denial of his initial postconviction petition, the Supreme

21  Court of Nevada addressed Madrid's claims that trial counsel was ineffective in failing to

22  investigate and impeach witnesses, but declined to consider claims that counsel was ineffective

23

in failing to adequately prepare Madrid to testify or hire a crime scene reconstruction expert.

The court determined the claims on appeal differed from those raised in the state district court:

> [A]ppellant argues that trial counsel was ineffective for failing to hire a private investigator to assist with pretrial investigation and for failing to adequately investigate.  Appellant contends that counsel's failure to investigate prevented him from developing defense witnesses and resulted in counsel's decision to downplay the gang aspect.  Appellant has failed to demonstrate deficiency or prejudice.  Counsel testified at the evidentiary hearing that he interviewed 15 to 20 witnesses and that he made a strategic decision to minimize appellant's gang affiliation at trial.  While appellant asserts that counsel's testimony was unbelievable, matters of credibility are left to the district court. *See State v. Rincon*, 122 Nev. 1170, 1177, 147 P.3d 233, 238 (2006).  Appellant fails to identify any witnesses that counsel should have investigated.

> [FN 1] In his reply brief, appellant argues that his trial counsel was ineffective for failing to interview J.S[.]  However, appellant did not raise this issue in his opening brief and, because a reply brief is limited to countering any matter set forth in the answering brief, we decline to consider this claim. *See* NRAP 28(c); *see also Bongiovi v. Sullivan*, 122 Nev. 556, 569 n.5, 138 P.3d 433, 443 n.5 (2006); *Elvik v. State*, 114 Nev. 883, 888 & n.6, 965 P.2d 281, 284 & n.6 (1998).

> Furthermore, while appellant contends that he was prejudiced by counsel's decision not to present evidence of gang involvement, he fails to explain how further investigation by counsel would have altered counsel's strategy at trial and thus have affected the outcome of the proceedings.  We therefore conclude that the district court did not err in denying this claim.

> . . . .

> [A]ppellant argues that he is entitled to post-conviction relief due to the cumulative errors of counsel.  He names as errors counsel's failure to adequately prepare appellant to testify, failure to prepare or advocate any defense, failure to consult or retain a crime scene expert or reconstructionist about blood spatters, and failure to object to evidence of gang affiliation, prior bad acts, and hearsay testimony.  Appellant failed to raise any of these claims of

> error below, and thus we decline to consider his claim of
> cumulative error. *See Davis,* 107 Nev. at 606, 817 P.2d at 1173.

Ex. 91 and ECF No. 31-9 at 4–5.

### c.      Exhausted Claims—Grounds 1(G)(a)–(c)—Failing to Investigate, Present, and Impeach Witnesses

The state supreme court reasonably applied *Strickland* when it concluded counsel reasonably investigated witnesses for the case.  The record shows lead counsel spoke with 15-to-20 witnesses, including Lackey, Duron (on numerous occasions), and D.F.  Lead counsel also visited the scene, took photographs, and investigated the gunshot residue evidence.  Counsel called a gunshot residue expert, Madrid, and Duron to testify.  Co-counsel prepared cross-examination for approximately 30 potential witnesses and prepared Madrid for his testimony.  Trial counsel filed a notice of intent to call a number of witnesses, attempted to locate witnesses, subpoenaed one witness, and investigated and noticed witnesses related to the gunshot residue.  Nothing in the state court record demonstrates that lead counsel's personally screening witnesses, instead of hiring an investigator to do so, was unreasonable or prejudiced Madrid.  Given that counsel received "upwards of 30" statements that witnesses provided to police, counsel was reasonable in screening the witnesses, particularly as the postconviction investigator discovered many were uncooperative or did not see the stabbing or the shooting.

Madrid claims the defense's gunshot residue expert was discredited.  But the record demonstrates counsel's decision to call the expert was reasonable as it was favorable to the defense theory that Madrid was not the shooter by suggesting it was possible for gunshot residue to appear on Madrid's clothes either because he was near the shooter or by secondary transfer.

Trial counsel did not unreasonably fail to interview and call witnesses B.D., C. H., D.F., and H.M. ECF No. 9-1 at 41–42.  B.D. was not at the party. C.H., D.F., and H.W. did not see the

shooter.  Although C.H., D.F., and H.W. claimed no knowledge of Madrid's gang membership or possession of weapons and would be surprised that photos exist of Madrid throwing gang signs, there is no reasonable probability the result of the proceedings would have been different had they testified at trial.  Photographs were presented that depicted Madrid throwing gang signs and eyewitnesses to the shooting heard Madrid invoke the Los Hermanos gang.

Madrid claims counsel was ineffective in his interview of Duron, but counsel testified he interviewed Duron several times prior to Duron's trial testimony.  Duron testified at trial, to no avail, that he did not see Madrid with a firearm or shoot anyone.  Although Duron testified at the postconviction evidentiary hearing that he heard shots before Madrid was stabbed and Madrid was not the shooter, at trial he likewise denied Madrid was the shooter and stated he heard gunfire "when" Madrid was stabbed.  Duron's testimony at the postconviction proceedings is not materially different from his trial testimony.  Thus, the state supreme court did not unreasonably conclude there is no reasonable probability the result of the proceedings would have been different had counsel had additional meetings with Duron about his trial testimony.

It was also reasonable to conclude counsel's failure to interview or call witnesses provided by Madrid's family was not unreasonable or prejudicial under *Strickland*.  Renee Madrid provided trial counsel with contact information for four potential witnesses (B.S., D.F., I.M., and R.M.).  Although counsel said he did not contact them, Madrid fails to show counsel's failure to do so was unreasonable or prejudicial as he presents no evidence their testimony would have helped the defense.

Madrid claims counsel was ineffective by failing to impeach Lackey with photographs that depict Lackey throwing gang signs and holding a shotgun. ECF No. 9-1 at 43.  The state supreme court reasonably concluded trial counsel made a strategic decision to minimize gang

affiliation at trial.  Lead counsel testified he saw the photographs pretrial and decided not to use them to impeach Lackey because the defense strategy was, in part, to minimize evidence that the shooting was part of a gang fight. *Id.*  Given the gang enhancement allegation, the state supreme court reasonably determined counsel's strategy was reasonable under the circumstances.

The state supreme court's application of *Strickland* was reasonable, and Madrid is not entitled to federal habeas relief on grounds 1(G)(a)–(c).

> **d.      Defaulted Claims—Ground 1(G)(d)— Failure to Investigate and Present Witnesses Evidenced in New Affidavits**

In his reply brief, Madrid alleges trial and postconviction counsel were each ineffective in failing to investigate and present affidavits of Gloria Gomez, Steven Scott, Christina Torres, and Adrian Jaramillo.  He asserts those affiants would have testified that Madrid was not the shooter, and three of them would have testified that another individual—who is apparently deceased— was the shooter. ECF Nos. 52 at 65–71; 52-1 at 5–19.  The affidavits were never presented to the state courts and were not included with the petition but were attached as exhibits to Madrid's reply brief in support of his petition. *Id.*

Madrid may not use the federal reply to amend the petition to add new claims.  The pleading standard for federal habeas petitions is "more demanding" than the notice pleading standard applicable to other civil cases. *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (noting that Fed. R. Civ. P. 8(a) requires only "fair notice" while Habeas Rule 2(c) demands more, mere legal conclusions without facts are not sufficient—"it is the relationship of the facts to the claim asserted that is important").  In habeas proceedings, Rule 2(c) "requires a more detailed statement," as it "instructs the petitioner to 'specify all the grounds for relief available to [him]' and to 'state the facts supporting each ground.'" *Mayle*, 545 U.S. at 649.  Accordingly, new

1   claims may not be presented for the first time in the federal reply. *Cacoperdo v. Demosthenes*, 37

2   F.3d 504, 507 (9th Cir. 1994).

3          The only way to add a new claim is by a properly filed amended petition.  Under Federal

4   Rule of Civil Procedure 15(a), a petitioner can amend the petition only with the respondents'

5   written consent or by obtaining leave of court to amend.  Under Rule 15(a)(2), leave to amend

6   should be freely given "when justice so requires."  But leave to amend "is not to be granted

7   automatically," and the court "considers the following five factors to assess whether to grant

8   leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of

9   amendment, and (5) whether plaintiff has previously amended his complaint." *In re W. States*

10  *Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 738 (9th Cir. 2013) (internal punctuation

11  omitted).  Leave to amend may be denied based upon futility alone. *Bonin v. Calderon*, 59 F.3d

12  815, 845 (9th Cir. 2004).  To assess futility, the court evaluates whether relief may be available

13  on the merits of the proposed claim. *Caswell v. Calderon*, 363 F.3d 832, 837–39 (9th Cir. 2004)

14  (conducting a two-part futility analysis reviewing both exhaustion of state court remedies and the

15  merits of the proposed claim).  If the proposed claims are untimely, unexhausted, or otherwise

16  fail as a matter of law, amendment should be denied as futile. *Id.*

17          Here, amendment to include the claims upon which the affidavits are based is futile.

18  First, assuming Madrid was permitted to amend to include the affidavits, the resulting claim that

19  trial counsel was ineffective in failing to investigate, interview, and present the affiants as

20  witnesses at trial is an unexhausted and procedurally defaulted claim because the affidavits, and

21  even the witnesses names, were never presented to the state courts in support of Madrid's claims

22  of ineffective assistance of trial counsel.  Second, in the context of determining whether Madrid

23  can overcome the procedural default of the claim under *Martinez*, I would be unable to consider

1   the affidavits unless Madrid met the requirements of 28 U.S.C. § 2254(e)(2) because he failed to

2   develop the state court record in accordance with state procedural requirements. *See supra*, pp.

3   17–18.  Finally, Madrid could not meet the requirements of 28 U.S.C. § 2254(e)(2)(B) because

4   the new affidavits do not demonstrate clear and convincing evidence that no reasonable

5   factfinder would have found Madrid guilty of the offenses.  The affidavits merely contradict the

6   testimony of four eyewitnesses who testified they saw Madrid shoot R.M.  Thus, it would be

7   futile to grant Madrid leave to amend the petition to add procedurally defaulted claims that trial

8   counsel was ineffective in failing to investigate and present the witnesses represented by

9   affidavits.  Madrid's belated claims of ineffective assistance of trial counsel based on the

10  affidavits will be dismissed with prejudice.

11          **e.      Ground 1(G)(e)—Failure to Adequately Prepare Madrid for**
                     **his Trial Testimony**

12

13          Madrid claims counsel "failed to adequately interview or meet" with him. ECF No. 9-1 at

14  42–43.  The respondents did not address this claim in their answer. ECF No. 49 at 13–16.

15  Madrid did not revisit this claim in his reply to the answer. ECF No. 52 at 63–78.

16          In his initial state postconviction proceedings, Madrid claimed counsel only met with him

17  "3 times and failed to discuss any meaningful substantive issues related to the preparation for

18  trial." Ex. 70 and ECF No. 29-5 at 11.  At the postconviction evidentiary hearing, lead counsel

19  testified he had five-to-ten meetings with Madrid before the preliminary hearing and several

20  times after that hearing. Ex. 78 and ECF No. 30-1 at 63–64.  Co-counsel testified he met with

21  Madrid during an initial "big picture" meeting with everyone at lead counsel's office, spoke with

22  Madrid near trial, and went to Madrid's house to prepare Madrid for his testimony. *Id.* at 13.

23

1    In Madrid's appeal from the state district court's denial of his initial postconviction

2  petition, he claimed counsel "[f]ailed to adequately prepare [Madrid] for his testimony," arguing

3  that despite counsel's postconviction evidentiary hearing testimony to the contrary, counsel spent

4  less than two hours with him. Ex. 85 and ECF No. 31-3 at 46.  The Supreme Court of Nevada

5  declined to consider the claim as part of a cumulative error argument because it had not been

6  raised below. Ex. 91 and ECF No. 31-9 at 5–6.

7    To the extent Madrid's petition now claims counsel did not spend adequate time with him

8  in preparation for trial, the state supreme court's determination that he failed to raise that claim

9  in the state district court is objectively unreasonable.  In each of his state court proceedings,

10  Madrid claimed trial counsel did not spend adequate time with him in preparation for trial.  I

11  therefore review the claim *de novo*. *E.g., Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As

12  a result of [the state court's] error, our review of petitioner's underlying . . . claim is

13  unencumbered by the deference AEDPA normally requires.").

14    On *de novo* review, I find Madrid fails to demonstrate trial counsel was ineffective in

15  failing to spend adequate time with him in preparation for his trial testimony.  According to the

16  state court record, trial counsel met with Madrid on numerous occasions before and after the

17  preliminary hearing, and prepared Madrid for his trial testimony.  And according to the trial

18  transcript, nothing about Madrid's testimony suggests counsel spent less time than counsel

19  represented or an inadequate amount of time preparing Madrid for trial.  Finally, Madrid fails to

20  show a reasonable probability that the trial result would have been different had counsel spent

21  additional time with him in trial preparation.  Thus, Madrid fails to demonstrate counsel's

22  performance was deficient or prejudicial under *Strickland*.  Madrid is not entitled to federal

23  habeas corpus relief for ground 1(G)(e).

1          **f.      Ground 1(G)(f)—Failure to Consult a Reconstruction Expert**

2          Madrid claims trial counsel was ineffective in failing to consult or hire a crime scene

3    reconstructionist. ECF No. 9-1 at 43.

4          In his initial postconviction proceedings, Madrid claimed counsel "unreasonably failed to

5    retain experts who could have reconstructed the crime scene; such experts would have informed

6    the jury of the complete infeasibility of Mr. Madrid's having fired a weapon from the location

7    described by the State's witnesses." Ex. 67 and 29-2 at 23; Ex. 70 and ECF No. 29-5 at 6; Ex. 72

8    and ECF No. 29-7 at 12–15.

9          In his appeal from the denial of his initial postconviction petition, Madrid claimed trial

10   counsel failed to consult or retain a crime scene expert or reconstructionist to challenge the

11   State's argument that Madrid's "blood trial [sic] was right in the same area as the alleged

12   location of the shooter" and "the blood wasn't pooled around" the location of Madrid's vehicle,

13   as "none of the blood at the crime scene was ever tested to identify its source." Ex. 85 and ECF

14   No. 31-3 at 51–52.  The Supreme Court of Nevada declined to consider the claim that counsel

15   was ineffective for "failure to consult or retain a crime scene expert or reconstructionist about

16   blood spatter" because Madrid failed to raise that claim of error below. Ex. 91 and ECF No. 31-9

17   at 5.

18         The respondents did not assert that this claim is unexhausted or procedurally defaulted in

19   their motion to dismiss the petition; nor did they squarely address it in the answer. ECF Nos. 19

20   at 11–18; 49 at 13, 23.  As discussed above, a liberal reading of Madrid's petition indicates he

21   contends that he can overcome his failure to exhaust and procedural default of this claim under

22   *Martinez*.

23

Madrid fails to provide a substantial claim that trial counsel was ineffective in failing to consult or call a reconstruction expert.  The parties utilized photographs and witness testimony to orient the jury to the scene of the crime, including the locations where individuals and vehicles were located, and where police found blood, bullets, and bullet cartridges.  Multiple witnesses testified to the location of Madrid and his vehicle.  Madrid fails to show that an expert would have evidentiary support for a theory that it was impossible for him to shoot R.M. from his location at the scene.

Ground 1(G)(f) will be dismissed because, on this record, Madrid fails to show a substantial claim that trial counsel's failure to call a reconstruction expert was either deficient or prejudicial.

      **3.**        **Ground 1(H)—Failure to Investigate, Hire an Investigator, or Consult and Expert to Refute the Gang Evidence**

Madrid claims trial counsel was ineffective in failing to properly respond to gang evidence because he failed to investigate, hire an investigator, or consult an expert to refute (a) the State's expert testimony on what constitutes gang membership; (b) the State's expert's opinion that rap artists are gang members; and (c) the State expert's testimony suggesting rap song lyrics are a confession of illegal conduct. ECF No. 9-1 at 46–47.  Madrid further alleges trial counsel was ineffective in failing to object that evidence of membership in a group was only relevant at the penalty phase. *Id.* at 47–48.

In his initial state district court postconviction petitions, Madrid's alleged trial counsel was ineffective for failing to (a) attack the State gang expert's determination of Madrid's gang membership based on contact with gang members and that rap artists are gang members; (b) seek discovery of the police files related to Madrid's gang affiliations; (c) move in limine for all opinions to be offered by the State's expert witness and to preclude all other opinions; (d) call

witnesses to testify that Madrid had no gang affiliations; and (e) object to testimony that

Madrid's father was a gang member and call Madrid's father to testify to refute the allegation

that gang members can never leave a gang. Ex. 70 and ECF No. 29-5 at 9, 11; Ex. 72 and ECF

No. 29-7 at 9–12, 20.

On appeal to the Supreme Court of Nevada, Madrid changed his allegations to state that

trial counsel was ineffective in failing to investigate and hire an investigator to challenge the

State's expert's testimony (a) on what constitutes gang membership and that rap artists are gang

members; and (b) that Madrid's lyrics in his rap album were confessions of his illegal conduct.

Ex. 85 and ECF No. 31-3 at 33–34.  He further alleged trial counsel was ineffective in failing to

(c) investigate the need for an expert to counter the State's expert regarding the [g]ang

[e]nhancement/designation[;] (d) confer with an expert to cross-examine the State's expert about

what constitutes gang membership; and (e) object that the evidence of gang affiliation was

inadmissible because it, among other things, lacked foundation. *Id.* at 40–42, 52.

The Supreme Court of Nevada declined to consider the claims:

> [A]ppellant argues that trial counsel was ineffective for
> failing to investigate the need for an expert to counter the State's
> expert witness testimony regarding the gang enhancement.
> Appellant argued below that counsel was ineffective for failing to
> attack the State's gang expert.  Because the argument on appeal is
> not the same as that raised below, we decline to consider it. *See*
> *Ford v. Warden*, 111 Nev. 872, 884, 901 P.2d 123, 130 (1995)
> (stating that an appellant "cannot change [his] theory underlying an
> assignment of error on appeal").

> [A]ppellant argues that he is entitled to post-conviction
> relief due to the cumulative errors of counsel.  He names as errors
> counsel's failure to adequately prepare appellant to testify, failure
> to prepare or advocate any defense, failure to consult or retain a
> crime scene expert or reconstructionist about blood spatters, and
> failure to object to evidence of gang affiliation, prior bad acts, and
> hearsay testimony.  Appellant failed to raise any of these claims of

> error below, and thus we decline to consider his claim of
> cumulative error. *See Davis,* 107 Nev. at 606, 817 P.2d at 1173.

Ex. 91 and ECF No. 31-9 at 4–5.

The respondents previously moved to dismiss ground 1(H) as unexhausted and procedurally defaulted. ECF No. 19 at 11–14 & n.6.  In their reply brief in support of their motion to dismiss, however, the respondents stated, "[u]pon additional review of Madrid's Petition and the state court record, the respondents withdraw their assertion that ground 1(H) is unexhausted." ECF No. 40 at 6.  I previously noted the respondents conceded ground 1(H) is neither unexhausted nor procedurally defaulted. ECF No. 41 at 6, n.3.

In answer to the petition, the respondents now assert that any claims in ground 1(H) not raised in the state district court and the Supreme Court of Nevada are unexhausted and fail on the merits. ECF No. 49 at 20.  The respondents claim their prior withdrawal of the assertion is not an express waiver of the procedural defense and Madrid did not object. ECF No. 49 at 13–20 & n.3. The respondents may waive the exhaustion requirement so long as the waiver is express. 28 U.S.C. § 2254(b)(3).  Because the respondents did not expressly waive exhaustion but merely withdrew the contention, and because Madrid alleges he can show "substantial" claims of ineffective assistance of counsel for ground 1(H), I will treat unexhausted portions of ground 1(H) as technically exhausted but procedurally defaulted subject to Madrid overcoming the default under *Martinez*. *See* ECF No. 52 at 100.

### a.      Ground 1(H)(a)–(c)—Exhausted Claims

Madrid appears to have exhausted ground 1(H)(a)–(c) in the state courts by claiming that trial counsel was ineffective in failing to challenge the State expert's testimony on what constitutes gang membership and that all rap artists are gang members.  But the Supreme Court

of Nevada did not rule on the claims.  I find, on *de novo* review, that Madrid fails to establish

trial counsel's performance in failing to challenge the State's gang expert was deficient or

prejudicial under *Strickland* for the same reasons why I find Madrid has failed to establish a

substantial claim that counsel was ineffective in failing to investigate, hire an investigator, or

consult an expert, to refute that expert testimony, as discussed below.

### b.      Procedurally Defaulted—Ground 1(H)(d)–(e)

Madrid's claims that trial counsel was ineffective in failing to investigate, hire an

investigator, or consult an expert to refute the State's expert testimony on (a) what constitutes

gang membership; (b) that all gang members are rap artists; and (c) rap lyrics are confessions of

illegal conduct, are unexhausted and procedurally defaulted, subject to Madrid showing cause

and prejudice under *Martinez*.  These claims were not fully and fairly presented to each of the

state courts in Madrid's initial postconviction proceedings. *See supra*, at pp. 49–51.

Detective Hutchison testified, as a gang expert, that gang members are identified by self-

admission, tattoos, clothing, artwork, their association with known gang members, or their use of

gang hand signals. Ex. 29 and ECF No. 26-2 at 76–77, 81.  He also identified Madrid as a

documented Los Hermanos gang member. *Id.*  Trial counsel reasonably challenged Hutchison's

testimony by eliciting Madrid's testimony that he is not a gang member, has no gang tattoos, his

gang attire was part of his rap artist persona, it is common knowledge he is a "poser," and he was

never "jumped into" or initiated into any gang. *See supra* pp. 8–9.  Madrid further testified that

he could not be a member of Los Hermanos or any gang because his "shout outs" in his CD

pamphlet to members of other gangs would probably get him killed. *Id.*  Trial counsel also

challenged Hutchison's opinion that Madrid was a gang member by eliciting testimony from

Detective Fuentes that gang members are not usually cooperative with police, while Madrid was

1  cooperative. Ex. 27 and ECF No. 25-4 at 101.  Madrid fails to show that, on this record, there is

2  any substantial basis to conclude that counsel's failure to investigate, hire an investigator, or

3  consult an expert on the requirements for gang membership was unreasonable.

4       Madrid also fails to state a substantial claim that there was a reasonable probability the

5  result of the proceedings would have been different had counsel investigated, hired an

6  investigator, or consulted an expert to refute the requirements for gang membership.  Gang

7  membership was not a requirement for the charged gang enhancement.  Rather, the State was

8  required only to prove that Madrid committed a felony "knowingly *for the benefit of, at the*

9  *direction of, or in affiliation with,* a criminal gang, with the specific intent to promote, further or

10  assist the activities of the criminal gang." Ex. 30 and ECF No. 27-1 at 2;  NRS § 193.168(1)

11  (emphasis added).

12       Madrid fails to demonstrate a substantial claim that trial counsel's failure to investigate,

13  hire an investigator, or consult an expert on the topic whether all rap artists are gang members,

14  was unreasonable under *Strickland*'s performance prong.  Contrary to Madrid's claim, Detective

15  Hutchison did not testify that all rap artists are gang members.  Hutchison contrasted rap artists

16  who are gang members—such as Fifty Cent and Snoop Dog—with rap artists who are not gang

17  members—such as Vanilla Ice whom he said, "is a rapper who started trying to be hard core" but

18  his albums did not sell because he "had no street credibility" and "wasn't a real gangster." Ex. 29

19  and ECF No. 26-2 at 93–94.  Trial counsel reasonably used Hutchison's testimony to align

20  Madrid with rap artists who are less successful because of their lack of gang member status when

21  he elicited Madrid's testimony that he is a "poser," whose CD sales did not skyrocket as a result

22  of the crimes alleged in this case.

23

Madrid further fails to demonstrate a substantial claim that trial counsel's performance in response to Hutchison's testimony about the relationship between rap song lyrics and the lives of rappers was unreasonable.  In discussing whether rap artists rap about their personal experiences, Hutchison testified:

> So to be a gangster rapper you need to – what they say back in the hip-hop community or the rap community is, rap music is the poetry of the streets.  It talks to you and tells the story of the individuals who live on the streets, and what they do and what they see.  So to rap about it, you're living that lifestyle and you've participated in some of the stuff that you've rapped about, because you're telling your story.

*Id.* at 93–94.  As discussed above, however, Hutchison also testified that successful rap artists are gang members, and rappers who are not gang members are less successful.  Trial counsel cross-examined Hutchison by asking whether Eminem's singing about beating up his mother meant that he beat up his mother and Hutchison responded that Eminem was arrested for beating his wife. *Id.* at 95.  Trial counsel asked whether Kid Rock singing about burning down a trailer meant that he was talking about having burned down a trailer and Hutchison agreed that it was so. *Id.*  At the state postconviction evidentiary hearing, trial counsel testified that this "sarcastic" cross-examination of Hutchison was meant to show that Hutchison's testimony that all rap artists sing about their personal experiences is an overgeneralization. Ex. 78 and ECF No. 30-1 at 70.

Madrid has failed to state a substantial claim that trial counsel's performance in response to the State gang expert's testimony concerning the requirements of gang membership, that rappers are gang members, or that rapper sing about their life experiences, was prejudicial under *Strickland*.  Eyewitnesses testified they heard Madrid invoke or announce "LH" or "Los Hermanos" or state, "this is Henderson side," and saw him make a gang hand gesture, just prior to the shooting.  There was evidence that photographs depicted Madrid throwing gang signs, and that he wore gang-style clothing, sang rap songs about gang life, and presented "shout outs" to

Los Hermanos and other gangs in his CD pamphlet.  Thus, even had counsel investigated, hired an investigator, or consulted an expert to challenge Hutchison's testimony on the topic of what constitutes gang membership or his opinions that all rap artists are gang members and commit the acts mentioned in their rap song lyrics, the record fails to support a substantial claim that there was any reasonable probability that doing so would have changed the result of the proceedings.

Madrid also claims trial counsel was ineffective in failing to object that evidence of membership in a group was only relevant at the penalty phase. ECF No. 9-1 at 47–48.  The respondents did not squarely address this claim in their answer. ECF No. 49.  It does not appear that this claim was raised in the state courts for consideration and is therefore unexhausted and procedurally defaulted, subject to Madrid showing cause and prejudice under *Martinez*.

Madrid fails to demonstrate a substantial claim of ineffective assistance of trial counsel to overcome the procedural default as the claim plainly has no merit.  As discussed, gang membership was not a requirement for the charged gang enhancement.  It was, however, relevant to proving the charged gang enhancement.  Evidence of gang membership was properly admitted at trial to prove motive and Madrid's gang affiliation and loyalty for the purpose of proving the charged gang enhancement.  Thus, Madrid makes no substantial claim that counsel's failure to object that such evidence was only admissible at the penalty phase of his trial was objectively unreasonable and there is no reasonable probability the result of the proceedings would have been different had counsel made such an objection.

### C.   Ground 1(I)—Failure to File Pretrial Motions and Obtain Criminal History

Madrid alleges trial counsel was ineffective for failing to (1) file pretrial motions or (2) obtain criminal histories of key prosecution witnesses. ECF No. 9-1 at 48–51.

### 1.     Additional Background

At the postconviction evidentiary hearing, trial counsel each testified they did not file any pretrial motions. Ex. 78 and ECF No. 30-1 at 19, 47.  They each testified they did not request criminal histories for the State's witnesses, and lead counsel agreed they had no idea whether the witnesses had criminal histories or gang affiliations. *Id.* at 18–19, 47.  Co-counsel testified he prepared for and conducted the cross-examination of the State's witnesses but did not request the criminal histories for any of them and did not speak with anyone on the State's witness list prior to trial. *Id.* at 18–20.  Lead counsel agreed the State was obligated to provide the defense with information about felony convictions for crimes of dishonesty that occurred within 10 years prior to the testimony of the State's witnesses. *Id.* at 68–69.  Lead counsel said he asked the State prosecutor whether there was anything about the witnesses he should know. *Id.* at 73.  Lead counsel also testified that during his cross-examination of Detective Hutchison, he asked whether Madrid had felony convictions because Madrid did not. *Id.* at 70.

### 2.     State Court Determinations

The Supreme Court of Nevada rejected these claims:

> [A]ppellant argues that trial counsel was ineffective for failing to file any pretrial motions and for failing to request criminal histories on the State's key witnesses.  Appellant has failed to demonstrate prejudice.  Appellant does not identify any pretrial motions and presents no cogent argument as to counsel's failure to file any motions. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987).  While he contends that counsel should have requested criminal histories of the witnesses, he does not allege what the criminal histories would have revealed or how they would have altered the outcome at trial. *See Molina v. State*, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004).  We therefore conclude that the district court did not err in denying these claims.

Ex. 91 and ECF No. 31-9 at 4.

### 3.     Ground 1(I)(a)—Failure to File Pretrial Motions

The state supreme court's rejection of ground 1(I)(a) constitutes an objectively reasonable application of Supreme Court authority to the facts in the record.  Except for claims discussed elsewhere in this order, Madrid provided the state courts with a list of pretrial motions as a part of a conclusory claim that counsel's failure to file pretrial motions was ineffective, without explaining facts that would establish counsel's failure to do so was unreasonable or prejudicial. Ex. 67 and ECF No. 29-2 at 23–25; Ex. 70 and ECF No. 29-5 at 6–9; Ex. 72 and ECF No. 29-7 at 16, 20.  On appeal from the denial of the initial postconviction petition, Madrid generally alleged counsel failed to file pretrial motions without demonstrating either that the failure to do so was unreasonable or a reasonable probability the result of the proceedings would have been different had counsel done so. Ex 85 and ECF No. 31-3 at 35, 40.  Madrid's conclusory allegations demonstrate the state supreme court's application of *Strickland*'s prejudice prong to the record was reasonable. *See* ECF No. 9-1 at 48–51.  Thus, Madrid is not entitled to federal habeas relief for ground 1(I)(a).

### 4.     Ground 1(I)(b)—Failure to Seek Criminal Histories

Madrid presented no evidence in his initial state postconviction proceedings that the State's witnesses had felony histories. Ex. 85 and ECF No. 31-3.  Thus, the state supreme court reasonably applied *Strickland*'s prejudice prong in concluding Madrid failed to show counsel was ineffective.

In his reply brief in support of his petition, Madrid attached exhibits purporting to show Lackey, Cervantes, S.D., and F.S., had criminal histories when they testified. ECF No. 52-1 at 39–69, 79.  Amending the petition to include those exhibits is futile because none of the exhibits shows any of those witnesses had a felony conviction at the time of trial (i.e., February 26, 2007

to March 9, 2007).  *See, supra*, pp. 48–49; *see also* ECF No. 52-1 at 39–69, 79; Ex. 21 and ECF Nos. 24-1; Ex. 35 and ECF No. 27-5.  Madrid is not entitled to federal habeas corpus relief for this ground.

**IV.     Certificate of Appealability**

Under Rule 11 of the Rules Governing Section 2254 Cases, I must issue or deny a certificate of appealability (COA) when I enter a final order adverse to the petitioner.

As to the claims rejected on procedural grounds, the petitioner must show: (1) that jurists of reason would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  While both showings must be made to obtain a COA, "a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." *Id.* at 484.  Where a plain procedural bar is properly invoked, an appeal is not warranted. *Id.*

I deny a COA as to all claims.  Jurists of reason would not find it debatable or wrong whether I am correct in my procedural ruling dismissing grounds 1(A)–1(F), 1(G)(d) and (f), 1(H)(d)–(e), 1(J), 2, 3, 4, and 5 as unexhausted and procedurally defaulted for the reasons stated above and in my prior order (ECF No. 41).  And reasonable jurists would not find my assessment of grounds 1(G)(a)–(c), and (e), 1(H)(a)–(c), and 1(I) debatable or wrong.

**V.     Motion for Copy of Docket**

Madrid filed a request for a copy of the docket in this matter. ECF No. 54.  Generally, an inmate has no constitutional right to free photocopying or to obtain court documents without payment.  Federal courts do not allow prisoners or any other litigants to accrue copy fees; rather,

1  payment for copy fees is required at the time a request is made.  Nothing in federal law, the

2  Federal Rules of Civil Procedure, the Local Rules of Practice, or established case law authorizes

3  federal courts to waive or finance copy fees in closed habeas cases.  Payment is required for all

4  copies of documents contained in the court's files, including a copy of the docket.  However, as a

5  one-time courtesy to Madrid, I will grant his request and direct the clerk's office to send to him

6  one copy of docket sheet for this matter.

7  **VI.    Conclusion**

8        I THEREFORE ORDER that grounds 1(G)(a)–(c) and (e), 1(H)(a)–(c), and 1(I) are

9  **denied** on the merits; grounds 1(A)–1(F), 1(G)(d) and (f), 1(H)(d)–(e), 1(J), 2, 3, 4, and 5 are

10  **dismissed** with prejudice; and the petition **(ECF Nos. 9–9-3) is denied** with prejudice.

11        I FURTHER ORDER that any requests for an evidentiary hearing are **denied**.

12        I FURTHER ORDER that a Certificate of Appealability is **denied**.

13        I FURTHER ORDER that Madrid's request for a copy of the docket for this action is

14  granted as a one-time courtesy, and I direct the clerk of the court to send Madrid one copy of the

15  docket sheet.

16        I FURTHER ORDER the clerk of the court to substitute William Hutchings for the

17  respondent Jerry Howell.

18        I FURTHER ORDER the clerk of the court to enter a final judgment in favor of the

19  respondents and against Madrid dismissing this action with prejudice and to close this case.

20  Dated: September 6, 2022.

21                                                            _____

22                                                            ANDREW P. GORDON
                                                              UNITED STATES DISTRICT JUDGE

23